816 F.2d 1296
 VEREX ASSURANCE, INC., Plaintiff-Appellee,
v.
JOHN HANSON SAVINGS AND LOAN, INC., Defendant-Appellant,
and
Maduff & Sons, Inc., First Federal Savings and Loan
Association, Defendant.
VEREX ASSURANCE, INC., Plaintiff-Appellee,
v.
MADUFF MORTGAGE CORPORATION, Defendant-Appellant,
v.
JOHN HANSON SAVINGS & LOAN ASSOCIATION; First City Federal
Savings and Loan Association, Defendant-Third
Party Plaintiff.
 Nos. 86-3511, 86-3563.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 5, 1987.
Decided Jan. 28, 1987.
Designated for Publication May 11, 1987.
 
 Jack F. Olson, Portland, Or., for plaintiff-appellee.
 Jerome I. Braun, San Francisco, Cal. for defendant-appellant John Hansen Savings & Loan, Inc.
 Robert P. Stafford, Portland, Or., for defendant-appellant, Maduff Mortgage Corp.
 Appeal from the United States District Court for the District of Oregon.
 Before KOELSCH, GOODWIN and THOMPSON, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 In August 1982, Verex Assurance, Inc. ("Verex") insured mortgages for Maduff Mortgage Corporation ("Maduff") that were later sold to John Hanson Savings & Loan, Inc. ("John Hanson"). In November 1983, Verex sought declaratory relief to confirm its attempted rescission of the insurance contracts. The district court granted Verex summary judgment, "affirming its non-liability under the insurance policies," and "dismissing [Maduff's and John Hanson's] counterclaims." Although we find that the terms of the insurance certificates gave Verex the right to rescind coverage, John Hanson and Maduff raise genuine issues of material fact whether Verex lost this right. We affirm in part and reverse in part.
 
 FACTS
 
 2
 Verex is a mortgage guaranty insurer. It issues policies of insurance which protect lenders from default by borrowers on home mortgage loans. Maduff is a commercial mortgage company which sells some of its mortgage loans on the secondary market. See generally, Browne, "The Private Mortgage Insurance Industry, the Thrift Industry and the Secondary Mortgage Market: Their Interrelationships," 12 Akron L.Rev. 631 (1979). Prior to August 1982, Verex issued a "100% Coverage Master Policy" to Maduff, which enabled Maduff to submit requests for insurance on loans secured by real estate. During August 1982, Maduff applied to Verex for mortgage guaranty insurance on twenty-five residential properties in Beaverton, Oregon. Documentation submitted to Verex in support of Maduff's request for this insurance included real estate purchase contracts for each of the properties. These contracts indicated that each borrower would provide a down payment of at least $20,000. Verex evaluated the documentation submitted by Maduff, assessed the risks involved, and issued Maduff commitments to insure the mortgages. The commitments set forth the terms and conditions of coverage, including the amounts of the loans, the sales prices and appraised values of the properties securing the loans, and Verex's required loan-to-value ("LTV") ratios.[1] The commitments were issued effective August 10, 1982, before the sales of the properties that secured the loans were closed.
 
 
 3
 On August 31 and September 1, 1982, when the sales were closed, a settlement statement for each of the properties was generated by the escrow officer. The settlement statements set forth the actual sales prices, earnest monies paid, down payments made, and the amounts of the loans. The settlement statements were not provided to Verex, but were given to Maduff. After the closings, Maduff signed the insurance certificate portions of the commitments, returned the certificates to Verex unchanged, and paid the premiums for mortgage insurance on each of the loans. The insurance coverage was effective August 31, 1982.
 
 
 4
 On September 15, 1982, Maduff sold sixteen of the mortgage loans and assigned the respective insurance policies to John Hanson.[2] It appears that Verex participated to some extent in this transaction. John Hanson alleges that when its chief financial officer traveled to Oregon to discuss the Maduff sale, he met with a Verex account executive and a Verex secondary market trader; that the account executive vouched for the quality of the transaction; that the secondary market trader assured John Hanson the loans in the Maduff package were "100 percent insured"; and that the executive received a "sell credit" and the trader received a commission for their participation in the mortgage sale. John Hanson further alleges that Verex's endorsement and assurance of "100 percent insurance" influenced its decision to buy the loans.
 
 
 5
 During October and November 1982, Verex discovered that the property values described on its insurance commitments appeared to be inflated approximately ten percent above true market value. Additionally, specific borrowers did not appear to have sufficient income or cash flow to support repayment of the loans. Maduff was then designated an "X" risk lender--a designation Verex uses when its experience with a lender is "sufficiently negative that Verex does not wish to continue to accept loans from them. [Such lenders] generally are assigned [the "X"] classification due to excessive losses, lack of servicing, or detection of fraudulent loan submissions" (Verex Procedures Manual, Jan. 21, 1982).
 
 
 6
 By July 18, 1983, borrowers had defaulted on fourteen of the mortgage loans. Beginning in August 1983, John Hanson informed Verex that the escrow settlement statements in its possession indicated that no down payments had been made on the properties, and that in each transaction the loan amount exceeded the purchase price. Nonetheless, on August 31, 1983, Verex renewed the insurance coverage and accepted premium payments. Shortly thereafter, however, during September and October 1983, Verex attempted to return the premiums and rescind the insurance coverage because of discrepancies between the terms and conditions specified in the commitments and the information reported in the settlement statements. In its letters of rescission, Verex identified the following discrepancies:1. Representations that a cash down payment was to be made by the borrowers, whereas the settlement documents indicate that no cash down payment was made. Also, in certain other transactions, cash was paid to the borrowers at the closing.
 
 
 7
 2. The purchase prices stated on the application documents differ materially from those stated in the settlement documents.
 
 
 8
 On November 4, 1983, Verex brought this action for rescission and declaratory judgment. In its second amended complaint, Verex alleged that it was entitled to rescind because it had provided insurance coverage based upon material misrepresentations by or on behalf of Maduff. On August 16, 1985, Verex moved for summary judgment, alleging that it was not liable for claims on the insurance policies. To support this summary judgment motion, Verex argued that the insurance certificates included a clause that gave Verex the option to invalidate the contracts if terms and conditions of its commitments were revised or modified. It did not contend that Maduff's alleged misrepresentations entitled it to rescind.
 
 
 9
 In an opinion and order dated October 7, 1985, Verex Assurance, Inc. v. Maduff Mortgage Corp., 622 F.Supp. 85 (D.Or.1985), the district court granted Verex summary judgment, affirming Verex's non-liability under the insurance policies and dismissing Maduff's and John Hanson's counterclaims. The district court found "no evidence of any misrepresentations on the part of any party to this action," but concluded "that the actual transactions ... did not comport with the terms of the insurance contracts issued by Verex." 622 F.Supp. at 87. Maduff's motion for partial summary judgment was denied. On October 16, 1985, John Hanson submitted a "Motion in the Alternative to Re-argue, for Reconsideration, Amendment of Order, New Trial, or Findings." The district court denied this motion and issued additional findings that (1) as an assignee of Maduff, John Hanson's rights under the insurance policies were derivative; (2) Maduff did not act as an agent of Verex in its dealings with John Hanson; and, (3) no genuine issue of material fact existed concerning John Hanson's claims of estoppel, waiver, or laches. Although the district court did not address John Hanson's counterclaim against Maduff, it ordered entry of a final judgment pursuant to Federal Rule of Civil Procedure 54(b). John Hanson and Maduff filed this timely appeal. We have jurisdiction under 28 U.S.C. Sec. 1291. We affirm in part and reverse in part.
 
 DISCUSSION
 A. Standard of Review
 
 10
 We review de novo whether the district court properly granted summary judgment. United States v. Reliance Ins. Co., 799 F.2d 1382, 1384 (9th Cir.1986). Viewing the evidence in the light most favorable to John Hanson and Maduff, we must determine whether the district court correctly found that there was no genuine issue of material fact, and whether Verex was entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); Roberts v. Continental Ins. Co., 770 F.2d 853, 855 (9th Cir.1985).
 
 B. Rescission
 
 11
 Under Oregon law,[3] provisions for cancellation in an insurance policy will be enforced where the right to rescind is reserved in the contract. See Medford v. Pacific Nat'l Fire Ins. Co., 189 Or. 617, 628, 219 P.2d 142, 144, reh'g. denied, 189 Or. 646, 222 P.2d 407 (1950). See also Silver Eagle Co. v. National Union Fire Ins. Co., 246 Or. 398, 423 P.2d 944 (1967) (cancellation permitted where policy contained reservation giving insurer right to cancel upon ten days written notice and insurer exercised option to cancel once it knew details of increased risk). The Verex insurance certificates provide: "Any revision or modification of the terms and conditions submitted to you on this commitment, without prior consent of Verex Assurance, Inc. may, at Verex Assurance, Inc.'s option, invalidate this Commitment and Certificate." Thus, when Verex furnished the commitments to Maduff, it reserved the right to rescind coverage if the terms and conditions were modified or revised.
 
 
 12
 One of the commitments' terms and conditions was an LTV ratio of 80, or in some cases 79, percent. However, the actual sales prices as the transactions closed resulted in LTV ratios of more than 100 percent:
 
 The Commitments' Terms
 
 13
 Number Loan Amount Sales Price Appraised Value LTV Ratio
811840.0 71,200 89,000 89,000 80%
811833.7 71,200 89,000 89,000 80%
811801.9 72,000 90,000 90,000 80%
811808.6 72,000 91,000 91,000 79%
816629.3 72,000 90,000 91,000 80%
816476.2 72,000 90,000 90,000 80%
811791.8 72,000 90,000 91,000 80%
811827.2 72,000 91,000 91,000 79%
811850.7 72,000 90,000 90,000 80%
812118.4 72,000 0[4] 90,000 80%
811818.3 80,000 110,000 110,000 73%
811810.8 71,200 89,000 89,000 80%
811863.9 72,000 91,000 91,000 79%
812123.1 72,000 0[4] 91,000 79%
811920.1 72,000 90,000 90,000 80%
811904.0 72,000 89,000 89,000 80%
 
 The Actual Transactions as Closed
 
 14
 Number Loan Amount Sales Price LTV Ratio
811840.0 71,200 67,783 105%
811833.7 71,200 67,783 105%
811801.9 72,000 68,551 105%
811808.6 72,000 68,551 105%
816629.3 72,000 68,551 105%
816476.2 72,000 68,551 105%
811791.8 72,000 68,551 105%
811827.2 72,000 68,551 105%
811850.7 72,000 68,551 105%
812118.4 72,000 68,551 105%
811818.3 80,000 76,191 105%
811810.8 71,200 67,783 105%
811863.9 72,000 68,551 105%
812123.1 72,000 68,551 105%
811920.1 72,000 68,551 105%
811904.0 72,000 67,783 106%
 
 
 15
 When the sale and loan transactions closed on August 31, 1982, and the "Sales Price" and "LTV Ratio" conditions were not fulfilled, the option to rescind the commitments was triggered.
 
 
 16
 We reject John Hanson's contention that LTV ratio is not a material term. LTV ratio is material because it measures risk, the touchstone of an insurance contract. As the LTV ratio increases, the risk of insuring the loan also increases even though the amount of the loan remains the same. Cf. Alliance Fed. Sav. & Loan Assoc. v. Federal Home Bank Bd., 782 F.2d 490, 494 (5th Cir.) (lenders assume total risk for construction loans where loan-to-value ratios are 100 percent), modified, 790 F.2d 34 (1986). In evaluating the risk of insuring a loan, the mortgage guaranty insurer considers (1) the borrower's credit and cash equity to determine likelihood of repayment; and (2) the appraisal of the mortgaged property to determine whether the value of the security is adequate to protect the lender if the borrower defaults. See Browne, "The Private Mortgage Insurance Industry, The Thrift Industry and the Secondary Mortgage Market: Their Interrelationships," 12 Akron L.Rev. 631, 651 (1979). The risk Verex was willing to accept was implicit in the commitments' stated LTV ratios. Verex agreed to insure loans which were 80 percent of the value, or sales price (whichever was lower), of the property securing the loans. The difference between loan and sales price reflected the amount of cash equity each borrower would provide and the down payment Verex assumed would be paid. No down payments, however, were made. The actual loan-to-sales price ratios exceeded 100 percent.[5] The risk of insurance had increased, the terms of the commitments had been modified, and Verex was entitled to rescind.
 
 C. Waiver
 
 17
 We must inquire, however, whether Verex exercised its right to rescind in a timely manner. Once an insurance company acquires knowledge of facts constituting grounds for rescission, it must promptly rescind the policy or the right to rescind may be waived. See State Farm Fire & Casualty Co. v. Sevier, 272 Or. 278, 288, 537 P.2d 88, 93-94 (1975) (misrepresentations in policy); Ross v. Carlyle, 216 Or. 576, 578, 339 P.2d 1114, 1115 (1959) (delay may evidence an intent to ratify and abide by the contract); Burger v. Nationwide Mut. Ins. Co., 53 Or.App. 898, 905, 632 P.2d 1381, 1384 (1981) (insurer must act promptly to exercise election to rescind contract when it becomes aware of false information--cancellation notice timely when sent within six days of knowledge of misrepresentation).
 
 
 18
 The essence of waiver is knowledge.[6] Grau v. Northwestern Mut. Ins. Co., 221 Or. 240, 245, 350 P.2d 1082, 1084-85 (1960); Citizen's Valley Bank v. Meuller, 63 Or.App. 152, 155, 662 P.2d 792, 794 (1983). If the insurer fails to act after it discovers the grounds for rescission, or after it learns facts which would put a reasonably prudent insurer on notice to inquire further, the right to rescind may be waived. 7 G. Couch, Couch on Insurance (Second) Sec. 35:254, at 386-87 (rev. ed. 1985); see, e.g., First Pennsylvania Banking and Trust Co. v. United States Life Ins. Co., 421 F.2d 959, 963 (3rd Cir.1969); Union Ins. Exch., Inc. v. Gaul, 393 F.2d 151, 155 (7th Cir.1968).
 
 
 19
 At the time of the closings, when Maduff returned the insurance certificates to Verex on August 31, 1982, Verex apparently did not know that the actual terms of the sales transactions differed from the terms set forth on the commitments. The settlement statements for the transactions were not furnished to Verex at this time. By the end of November 1982, however, Verex had discovered that (1) some borrowers might be unable to make their mortgage payments; (2) some appraisals were inflated by approximately ten percent,[7] and (3) some warnings and questions about the loans had been voiced by the re-insurer, Mortgage Guaranty Insurance Corporation, who had refused to insure the loans directly because they were considered over-valued. Although Verex may have considered this information mere bits of detritus from its post-closing investigation, it was of such significance to Verex that it placed Maduff in the "X" lender category. These circumstances raise genuine issues of material fact as to what information Verex possessed and when it acquired that information, as well as the mixed question of law and fact of whether the information Verex possessed was sufficient to require further inquiry.
 
 
 20
 There also appears to be a mixed question of law and fact, which should be addressed by the trial court, whether Verex waived its right to rescind by accepting the renewal premiums and renewing the insurance certificates on August 31, 1983, after John Hanson notified it that no cash down payments had been made and that each mortgage loan exceeded the purchase price. Verex did not begin to tender the return of the premiums until early September. See Reserve Life Ins. Co. v. Howell, 255 Or. 71, 78, 357 P.2d 400, 406 (1960) (accepting premiums with knowledge of facts which may render a policy void waives the right to avoid the policy), rev'd on other grounds, Bunn v. Monarch Life Ins., 257 Or. 409, 478 P.2d 363 (1971).
 
 
 21
 Verex argues that waiver and estoppel cannot create insurance coverage, and that waiver cannot create coverage for a loss arising out of a risk which is not within the terms of the contract. We agree that under Oregon law neither waiver nor estoppel can be the "basis for creating an original grant of coverage where no such contract previously existed." Schaffer v. Mill Owners Mut. Ins. Co., 242 Or. 150, 156, 407 P.2d 614, 617 (1965); see Baton v. Transamerica Ins. Co., 584 F.2d 907, 911 (9th Cir.1978); but see Allstate Ins. Co. v. State Farm Mut. Auto. Ins. Co., 67 Or.App. 623, 679 P.2d 897, 881 (1984) ("An insurer may be estopped from denying coverage when the party claiming coverage has acted in reasonable reliance on an agent's representation of coverage that is not patently absurd."). Here, however, the insurance "contract[s] previously existed." The contracts specifically provided that "Any revision or modification of the terms and conditions submitted to you on this commitment ... may, at Verex['s] option, invalidate this Commitment and Certificate" (emphasis added). This language, chosen by Verex and placed in its commitments, gave Verex the contractual option to invalidate insurance coverage when the actual sales prices at the closings differed from the terms and conditions of the commitments. But, this language also gave Verex the right not to invalidate coverage. When Verex learned of discrepancies between the terms and conditions of the commitments and the transactions as actually closed, it had the option to invalidate the insurance or to continue coverage, accept any modified risk, and continue to receive premiums. It is this contractual option that renders Verex's obligation to provide insurance coverage voidable, and not void. And it is this contractual option which distinguishes this case from Schaffer, 242 Or. 150, 407 P.2d 614, and Baton, 584 F.2d 904.
 
 D. John Hanson's Rights As Assignee
 
 22
 John Hanson argues that its position as a bona fide purchaser cut off any rights to rescind that Verex may have been able to assert against Maduff. John Hanson cites Couch for the proposition that:
 
 
 23
 Where the insurer consents to an assignment, it may be deemed to have waived defenses which it could have asserted against the original insured, the theory being that by consenting to the assignment, the insurer necessarily recognizes the existence of a binding contract which can be assigned. Hence it has been held that an insurer, after it has assented to an assignment, cannot set up, in defense to an action by an assignee, fraud in the original application, and that consent to a transfer or assignment waives a prior breach of conditions.
 
 
 24
 However, the quoted language is directly followed by: "That is to say, where the insurer at the time it gives consent to the assignment knows of the basis for claiming it invalid but nevertheless consents to the assignment, the insurer is barred from thereafter asserting the particular ground for invalidity as against the assignee." 16 G. Couch, Couch on Insurance (Second) Sec. 63:205, at 846-47 (rev. ed. 1985) (emphasis added). Verex may not have known of any problems with the loans by September 15, 1982, when Maduff assigned its interests to John Hanson. The question, however, of what Verex knew and when is a factual issue to be resolved at trial.
 
 E. The Counterclaims Against Verex
 
 25
 Maduff asserted six counterclaims against Verex: (1) indemnity; (2) recovery under the policies; (3) breach of contract; (4) negligence; (5) fraud; and (6) a claim for punitive damages. John Hanson asserted counterclaims against Verex for recovery under the policies and negligence.
 
 1. Indemnity
 
 26
 Maduff's agreement with John Hanson requires Maduff to repurchase the loans if they were not validly insured. Maduff seeks indemnity from Verex to meet this contingency. However, if the loans are not insured, it will be because Verex is not liable under the policies. In that event, Maduff will have no right of indemnity from Verex. On the other hand, if Verex is liable and the policies are in force, Maduff will not have to repurchase the loans from John Hanson. It will have no need for indemnity from Verex. This counterclaim was properly dismissed.
 
 2. Recovery Under the Policies
 
 27
 Both Maduff and John Hanson assert counterclaims against Verex for recovery under the policies. Genuine issues of material fact exist concerning whether Verex waived its contractual right to rescind.[8] Thus, Verex may be liable on the policies and John Hanson or Maduff may be able to recover. We reverse summary judgment on these counterclaims against Verex for recovery under the policies.
 
 3. Breach of Contract
 
 28
 Maduff claims that Verex has breached its express and implied contractual obligations. Maduff's breach of contract counterclaim rests on the argument that Verex had a duty to disclose to Maduff results of its post-underwriting review. However, neither the Master Policy, nor the Commitments, nor the Certificates contain any promise by Verex to conduct a post-underwriting review, or to inform Maduff of the results of such a review. The district Court properly dismissed this counterclaim.
 
 4. Negligence
 
 29
 Both John Hanson and Maduff allege that Verex was negligent. John Hanson alleges that Verex was negligent in issuing the certificates of insurance without inspecting or demanding to inspect the documents underlying each mortgage to determine that the information on the applications was correct. Maduff claims that Verex negligently failed to evaluate the insurance policies according to its own underwriting guidelines.
 
 
 30
 Generally, under Oregon law, an insurer may rely upon representations by an applicant for insurance, even if the insurer was negligent in failing to investigate the insured. Burger v. Nationwide Mut. Ins. Co., 53 Or.App. 898, 902-03, 632 P.2d 1381, 1383 (1981); see Kubeck v. Consolidated Underwriters, 267 Or. 548, 517 P.2d 1039 (1974) (fraudulent misrepresentations). We have previously held that "under Oregon law an insurer has no duty to investigate where the application is 'incomplete on its face,' unless the omissions are so obviously material that reliance on the incomplete application would be reckless." Kraus v. Prudential Ins. Co. of Am., 799 F.2d 502, 505 (9th Cir.1986). Here, however, it is asserted that Verex assumed an active role in Maduff's sale of the loans and insurance certificates to John Hanson, and that Verex assured Maduff and John Hanson that the loans were 100 percent insured. In this rather unique setting, the extent of Verex's knowledge, and what it did and did not do, may become relevant factual inquiries in John Hanson's and Maduff's negligence claims. These factual issues should be resolved at trial. Accordingly, we reverse the summary judgment on the negligence counterclaims of John Hanson and Maduff against Verex.
 
 5. Fraud and Punitive Damages
 
 31
 Maduff's fifth and sixth counterclaims contain allegations that Verex made false and misleading misrepresentations and acted maliciously. Maduff seeks punitive damages. There is no evidence of any fraud, intentional misconduct or false representations by Verex. The fifth and sixth counterclaims were properly dismissed.
 
 CONCLUSION
 
 32
 1. We affirm the district court's denial of Maduff's motion for summary judgment.
 
 
 33
 2. We reverse the district court's order granting Verex's motion for summary judgment in which the district court determined that Verex was not liable under the insurance policies, except that we affirm that portion of the order which determined that Verex acquired the right to rescind the insurance contracts because the actual terms of the sales transactions did not conform to the terms specified on the insurance commitments. Whether Verex subsequently lost this right to rescind requires the resolution of genuine issues of material fact.
 
 
 34
 3. The district court's order granting Verex's motion for summary judgment dismissing John Hanson's and Maduff's counterclaims is affirmed in part and reversed in part as follows:
 
 
 35
 a. The portion of the order dismissing John Hanson's counterclaims is reversed.
 
 
 36
 b. The portion of the order dismissing Maduff's second and fourth counterclaims is reversed.
 
 
 37
 c. The portion of the order dismissing Maduff's first, third, fifth and sixth counterclaims is affirmed.
 
 
 38
 4. Each party shall bear its own costs for this appeal.
 
 
 39
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 [1]
 The parties agree that Verex calculates the LTV ratio by dividing the loan amount by the lower of either the sales price or the appraised value. (Pretrial order, Maduff Contentions of Fact at p 20; John Hanson Contentions of Fact at p 32)
 
 
 [2]
 The other nine were sold to First City Federal Savings & Loan Association, now known as Crossland Savings, Federal Savings & Loan Association. Crossland is not a party to this appeal
 
 
 [3]
 Oregon law applies to this diversity action between Verex, a Wisconsin corporation having its principal place of business in Wisconsin, and Maduff, a Nevada corporation having its principal place of business in Oregon, and John Hanson, a Maryland corporation having its principal place of business in Maryland. See, e.g., Insurance Co. of North America v. Howard, 679 F.2d 147, 149 (1982)
 
 
 [4]
 John Hanson argues that the $0 sales prices on two of the commitments means that Verex could not have believed that down payments were made, and that the resulting LTV ratios would be infinitely high. Thus, John Hanson urges us to reverse summary judgment for Verex on these two counts. Verex argues that the entries of $0 were a scrivener's error. As we interpret the contracts, and calculate from Verex's LTV formula--LTV ratio equals the loan divided by the lower amount of appraised value or sales price--for numbers 812188.4 and 812123.1, Verex agreed to insure loans with sales prices of at least $90,000 and $91,000, respectively. It is clear that the sales prices on the commitments for these two loans varied from the actual sales prices
 
 
 [5]
 Or.Rev.Stat. Sec. 743.705 provides:
 No mortgage insurer shall provide insurance with respect to an obligation which:
 * * *
 (b) Exceeds 95% of the fair market value of the securing property at the time the loan is made, or such higher percentage as may be authorized by the commissioner and permitted by the insurer's domicile. (Emphasis added).
 Generally, if an insurance contract violates a state statute, the contract is void. See, e.g., 9 G. Couch, Couch on Insurance (Second) Sec. 39:7, at 500 (rev. ed. 1985). For example, a life insurance policy issued to a person over sixty years of age, contrary to the terms of the applicable statute, is void. Id.; Johnson v. Central Mut. Ins. Ass'n, 346 Mo. 818, 143 S.W.2d 257 (1940). In this case, the loans exceeded 95 percent of the sales prices. If section 743.705 applies, an issue of fact will be whether the loans exceeded 95 percent of the fair market values of the properties at the time the transactions closed. Neither party has addressed the possible application of section 743.705.
 
 
 [6]
 Although we discuss waiver, John Hanson and Maduff also allege equitable defenses of estoppel, unclean hands, and laches. The question of Verex's knowledge also is critical to these defenses. See, e.g., Dillingham Corp. v. Employers Mut. Liab. Ins. Co., 503 F.2d 1181, 1185 (9th Cir.1974) (laches). We leave this inquiry for consideration by the district court on remand
 
 
 [7]
 This discrepancy would affect loan-to-value ratios. For example, one appraisal, dated November 1, 1982, gave Verex notice that the value for one of the properties (Number 811827.2) was in the range of $80-83,000, rather than $91,000, as indicated on the commitment. Even if Verex believed at this time that the actual sales price was $91,000, it was on notice that the loan-to-value ratio (loan divided by the lesser of sales price or appraised value) would be 87-90 percent. According to Verex's argument on appeal, such a modification of the terms and conditions of the commitment would constitute grounds for immediate rescission
 
 
 [8]
 As we have previously stated, estoppel may also apply. See note 6, supra