910 F.2d 118
 59 USLW 2119, Fed. Sec. L. Rep. P 95,410
 FOREMOST GUARANTY CORPORATION, Plaintiff-Appellee,
v.
MERITOR SAVINGS BANK, formerly known as The Philadelphia
Saving Fund Society, Defendant-Appellant,
Securities & Exchange Commission, Amicus Curiae,
and
Epic Mortgage Inc., Delaware Corp.; Community Savings &
Loan, Inc.; Dominion Federal Savings & Loan Association,
federal S & L Assn.; First National Bank of Maryland;
Silverado Banking Savings and Loan Association, Colo. Corp.;
Unity Loan and Building Company, Ohio, Defendants.
FOREMOST GUARANTY CORPORATION, Plaintiff-Appellee,
v.
FIRST NATIONAL BANK OF MARYLAND, Defendant-Appellant,
Securities & Exchange Commission, Amicus Curiae,
and
Epic Mortgage Inc., Delaware Corp.; Community Savings &
Loan, Inc.; Dominion Federal Savings & Loan Association,
federal S & L Assn.; Meritor Savings Bank, formerly known
as The Philadelphia Saving Fund Society; Silverado Banking
Savings and Loan Association, Colo. Corp.; Unity Loan and
Building Company, Ohio, Defendants.
FOREMOST GUARANTY CORPORATION; United Guaranty Residential
Insurance of Iowa, an Iowa Corp., Plaintiffs-Appellees,
v.
DOMINION FEDERAL SAVINGS & LOAN ASSOCIATION, federal S & L
Assn., Defendant-Appellant,
Securities & Exchange Commission, Amicus Curiae,
and
Epic Mortgage Inc., Delaware Corp.; Community Savings &
Loan, Inc.; First National Bank of Maryland; Meritor
Savings Bank, formerly known as The Philadelphia Saving Fund
Society; Continental Federal Savings Bank, a federal
savings bank; American Savings & Loan Association, an
Indiana Savings and Loan Assoc., individually & on behalf of
others similarly situated, Defendants.
UNITED GUARANTY RESIDENTIAL INSURANCE OF IOWA; Foremost
Guaranty Corporation, Plaintiffs-Appellees,
v.
EPIC MORTGAGE INC., Delaware Corp.; Community Savings &
Loan, Inc., Defendants-Appellants,
Securities & Exchange Commission, Amicus Curiae,
and
Dominion Federal Savings & Loan Association, federal S & L
Assn.; First National Bank of Maryland; Meritor Savings
Bank, formerly known as The Philadelphia Saving Fund
Society; Continental Federal Savings Bank, a federal
savings bank; American Savings & Loan Association, an
Indiana savings and loan assoc., individually & on behalf of
others similarly situated, Defendants.
 Nos. 88-3163 to 88-3165 and 88-3172.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 6, 1989.
Decided Aug. 6, 1990.
As amended Aug. 13, 1990.
Rehearing and Rehearing En Banc
Denied Sept. 4, 1990.
 
 William A. Slaughter, argued (Warren L. Dennis, Christopher Wolf, Michael I. Endler, on brief), Ballard, Spahr, Andrews & Ingersoll, Washington, D.C., William L. Stauffer, Jr., argued (Robert I. Chaskes, on brief), Frank, Bernstein, Conaway & Goldman, Tysons Corner, Va., for defendant-appellant.
 Eva Marie Carney, S.E.C., Washington, D.C., argued (Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Rosalind C. Cohen, Asst. Gen. Counsel, S.E.C., Arthur W. Leibold Jr., Frank J. Eisenhart, Jr., Robert M. Clark, Dechert, Price & Rhoads, Washington, D.C., Thomas A. Pfeiler, Gen. Counsel, U.S. League of Sav. Institutions, Chicago, Ill., on brief), for amicus curiae.
 Edward Cyrus Winslow, III (James T. Williams, Jr., Mack Sperling, on brief), Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, N.C., Irving P. Margulies, argued (Randal D. Shields, on brief), Weiner, McCaffrey, Brodsky & Kaplan, P.C., Washington, D.C., for plaintiff-appellee.
 Before WIDENER and WILKINSON, Circuit Judges, and HAYNSWORTH,* Senior Circuit Judge.
 WIDENER, Circuit Judge:
 
 
 1
 This case involves two insurance companies, United Guaranty Residential Insurance Company (United Guaranty) and Foremost Guaranty Corporation (Foremost), who seek to rescind mortgage insurance coverage because they claim the insurance was procured by fraud. It is reported in the district court as In re Epic Mortgage Ins. Litigation, 701 F.Supp. 1192 (E.D.Va.1988). The insurance covers loans originated by EPIC Mortgage Inc. (EMI) and sold to third parties[1] either as whole loans or mortgage pass-through certificates.[2] The insurance companies based their initial underwriting decision upon representations of EMI and its parent corporation, Equity Programs Investment Corporation (EPIC). These representations pertained to the workings of the EPIC organization, the particular aspect of which now being considered is the segregation of the funds available for the payment of the underlying loans, as well as the investment of such funds. The district court found that the insurers were justified in relying upon oral representations and allowed them to rescind because facts had been misrepresented. Because papers in the insurers' possession, however, indicated either that the oral representations in question were not true, or were at the least in conflict with the written statements, we hold that the insurers were not justified in relying on the oral representations. These same contradictions should have alerted the insurers that the facts now relied upon were not as represented and called for a duty on the part of the insurers to investigate. They did not. Accordingly, we reverse the decision of the district court permitting rescission.
 
 
 2
 The history of this case is lengthy and complex. It is set out in detail in the district court's extensive findings of fact. Briefly, EPIC served as a general partner in each of a series of a great number of limited partnerships set up to buy houses from builders. To purchase a property, a limited partnership would acquire a loan from EMI and secure it with a mortgage on the property. Investors bought into the limited partnerships through periodic capital contributions.
 
 
 3
 The partnerships bought houses and held them as rental properties until they were sold, ideally after a period of four to five years. The proceeds of the sale were to be used in the following order to pay (1) the expenses of the sale; (2) the mortgage loans; (3) any advances from EPIC; (4) limited partners' capital contributions; and, finally, (5) profits, if any, to EPIC and the limited partners according to an agreed-upon formula.
 
 
 4
 EMI represented that each seller of property provided a rebate called a rental deficit contribution to the limited partnership which had purchased the property to insure that the debt service of the mortgaged properties was paid each month. The amount of the rebate was calculated according to the guidelines of a worksheet designed for that purpose.[3]
 
 
 5
 Representatives of EMI met with those of the insurers on several occasions and made oral representations concerning the EPIC program. EMI represented that each partnership was formed and designed to be maintained separately. Each was to acquire a relatively small number of homes and maintain assets in the area of $4 to $5 million. Any loss incurred by one of the partnerships was to be independent from the other partnerships. The capital contributions of the limited partners were to be held solely for the benefit of that partnership. A builder rebate was also to be held exclusively for the particular partnership which generated it. Similarly, the monthly rental income from each partnership's properties was to be used only for the benefit of that partnership.
 
 
 6
 As partnerships reached their fifth year, however, they could not sell properties at a price high enough to cover the contributions of the limited partners.[4] The trouble began in early 1985, and EPIC had to camouflage the problems in order to attract new investors. Instead of taking a loss, EPIC would resyndicate the older partnerships.[5] This, however, contributed to the problem.
 
 
 7
 Because EPIC had to sell the property at a value high enough to cover the limited partnership contributions, and thus create the appearance that the concept was working, EPIC frequently asked appraisers to increase their original evaluations. In fact, EPIC routinely asked for more than one appraisal to this end. In addition, a resyndicated partnership lacked a builder to give a rebate required to fund the rental deficit contribution. As a result, the new partnership had the same property as the old and the difficulty in selling the home was merely displaced until a future time.
 
 
 8
 In addition to the resyndications, older partnerships were propped up with advances from EPIC which came from taking new partnership money and lending it to old partnerships. In spite of its oral representations concerning the independence of the individual partnerships, EPIC routinely withdrew all of the funds out of the partnerships as soon as they were received. The funds were not kept in separate accounts but rather were commingled in one large account and used to revive artificially the older, failing partnerships while immediately impairing the new partnerships from which the funds were taken.
 
 
 9
 The insurers' claim on which rescission is based is that EMI misrepresented the actual facts of the EPIC program and thus induced them to insure the loans. The insurers now claim that EPIC represented that the partnerships were separate and independent, and that funds were held in escrow, at a time when in fact the funds of all the partnerships were commingled and EPIC was using everyone's money to prop up the old partnerships; that properties of older partnerships were being sold without problems at a time when in fact EPIC's internal studies showed that the properties available to be sold could not be sold at a price sufficient to return the investors' capital; that investors were continuing to buy limited partnership interests at a time when in fact EPIC was unable to attract new investors and had stopped forming new partnerships; and that the EPIC group was in sound financial condition at a time when it was not in sound financial condition, and provided United Guaranty with false and misleading financial statements.[6]
 
 
 10
 The district court found that before the insurers began insuring EPIC loans they "visited EPIC's offices and reviewed written material about the EPIC Program, including financial statements, a private placement memorandum, certain explanatory promotional materials, and other documents."[7] The insurers do not dispute the district court's finding that they reviewed the memorandum.[8] The private placement offering memorandum provided the insurers with written statements contrary to the oral representations. Specifically, this document disclosed the general partner's (EPIC's) right to borrow from the limited partners' rental deficit contributions, as well as its right and practice of lending to the partnerships. Section V of this document, under the heading "ANTICIPATED SOURCES AND USES OF PROCEEDS," states:
 
 
 11
 A portion of this amount available for cash flow deficits may be borrowed by the General Partner pursuant to section 8(a)(XV) of the Partnership Agreement. In fact, the General Partner, prior to the date of this Memorandum, may have borrowed from and repaid to the Partnership up to the amount of the Builder Rebates. (See "Partnership Agreement,"....)
 
 
 12
 Section 8(a)(XV) of the partnership agreement states:
 
 
 13
 The General Partner shall have the right to borrow from the Partnership, at an interest rate not to be lower than 12%, funds which are temporarily not needed in the Partnership business and are not intended to be distributed (or immediately distributed) to the Partners....
 
 
 14
 Finally, under the heading Additional Potential Conflicts of Interest is the statement:
 
 
 15
 The Partnership Agreement provides that the General Partner may borrow Partnership funds at an interest rate of 12% per annum. Such borrowing is most likely to occur after the Limited Partners have made installment payments to the Partnership and such funds are not immediately required by the Partnership for working capital or from funds provided by the Builder Rebates while such funds are not immediately required by the Partnership for its operations or debt service.
 
 
 16
 EPIC Associates Private Placement Offering Memorandum 85-IV provides, for example, in Part XII, Conflicts of Interest, the following: "GENERAL PARTNER ADVANCES. The principal conflict of interest between the General Partners and the Limited Partners arises by reason of the General Partner's potential advances of monies to the Partnership ("Advances")." And, later in the same part, it provides: "As noted, the General Partner has in the past loaned funds or otherwise provided credit to various investment partnerships of which EPIC was a general partner in order to fund operating deficits." In Part XIV of the memorandum under the section on Profits, Losses and Cash Flow Distributions, in the section on distribution of cash from operations, it is provided that such distribution shall go "(i) First, to the General Partner to repay any advances made to the Partnership, together with interest thereon...."
 
 
 17
 The district court made the finding that the statements of the placement memorandum were "consistent with the representations made to United Guaranty and Foremost about the EPIC program." The principal contention of the insurers, however, at trial and on appeal, is that EMI orally represented that each partnership would stand alone and that the rental deficit contributions of each partnership would be held in escrow only for the use of that partnership. The placement memorandum with associated papers, on the other hand, discloses the right of the general partner to borrow from these funds as well as to lend to the partnership. The oral representations, then, are contrary to the written statements, for if the borrowing by EPIC from one partnership to lend to another is not a violation of the oral representations, the insurers have made no case in any event. Thus, that critical finding of fact is clearly erroneous under FRCP 52.
 
 
 18
 The parties take no issue with the conclusions of law of the district court with respect to rescission of a contract procured by fraud.[9] It noted that the defendant must have
 
 
 19
 made a representation relating to some material past or existing fact, that the representation was false, that defendant knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion, that defendant made the representation with the intention that it should be acted upon by the plaintiff, that the plaintiff reasonably relied upon the misrepresentation and acted upon it, and that the plaintiff suffered injury.
 
 
 20
 701 F.Supp. at 1243. This is general insurance law. 17 Couch on Insurance, 2d, Rhodes, (1983) Secs. 67:352, 67:354, 67:355. The district court analyzed the question as whether the insurers acted reasonably in relying upon the oral representations of EMI and held the insurers so acted. The question, however, is whether the insurers were entitled to rely upon such oral representations when they had inconsistent written statements in their possession.
 
 
 21
 On facts comparable to those at bar, in cases involving the right of rescission, the First and Tenth Circuits have considered whether a party may be justified in relying on oral representations when he has contrary written statements in his possession. In analyzing whether the parties involved were justified in relying on the misrepresentations, both courts looked to eight factors, which were:
 
 
 22
 (1) [t]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.
 
 
 23
 Kennedy v. Josephthal & Co. Inc., 814 F.2d 798, 804 (1st Cir.1987); Zobrist v. Coal-X Inc., 708 F.2d 1511, 1516 (10th Cir.1983).[10]
 
 
 24
 As noted, both the Kennedy and Zobrist cases concerned charges of fraud in the context of securities fraud litigation. The common element those cases have with the case at hand is that the investors were required to demonstrate they were justified in relying on the oral representations. Both courts held that the investors could not meet this burden in light of written statements in their possession contradicting the oral representations.
 
 
 25
 In Kennedy, investors relied on oral statements of a broker after they had been given a confidential offering memorandum containing contrary statements. In the context of a securities fraud claim, the court considered whether the investors' reliance on the misrepresentations was justified. With regard to the oral statements, the court said:
 
 
 26
 [T]he advice Sinclair [the broker] gave, however, consisted of oral misrepresentations completely at odds with the offering memorandum. This is precisely the relevant information that [the] appellants needed: it exposed the possibility of fraud.... The contradictions fairly lept [sic] from the pages of the offering memorandum when Sinclair spoke.... Justifiable reliance cannot be satisfied by this reckless conduct.... When they closed their eyes and passively accepted the contradictions between Sinclair's statements and the offering memorandum, appellants could not be said to have justifiably relied on the misrepresentations.
 
 
 27
 Kennedy, 814 F.2d at 805.
 
 
 28
 The Tenth Circuit considered a similar situation in Zobrist. There, an investor was given an offering memorandum but did not read it.[11] The memorandum contained several warnings concerning the investment including the statement: "[n]o person has been authorized to give any information or to make any representations not contained in this Memorandum ... and, if given or made, such information or representations must not be relied on."[12] Zobrist, 708 F.2d at 1517-18. In addition, the memorandum disclosed the high risk involved in the underlying coal venture. When investors attended meetings concerning the investment, however, they were told the investment was a "sure thing" and that it "couldn't miss." Zobrist, 708 F.2d at 1514. In light of the conflicts between the written and oral representations concerning the risks of the venture, the court concluded that the investors were not justified in relying on the oral representations. Zobrist, 708 F.2d at 1518. The court stated:
 
 
 29
 [W]hen knowledge of the disclosed risks is imputed to Phil Rasmussen [the investor], it is evident that he acted recklessly by intentionally closing his eyes to and failing to investigate the contradiction between the misrepresentations and the information in the memorandum. As a matter of law, Phil Rasmussen could not rely on the misrepresentations without further inquiry.
 
 
 30
 Zobrist, 708 F.2d at 1518-19.
 
 
 31
 The decisions in Kennedy and Zobrist are closely paralleled by our decision in Call Carl, Inc. v. BP Oil Corp. 554 F.2d 623 (4th Cir.1977). In that case, an action for fraud and deceit, we reversed a judgment for plaintiffs. The plaintiffs were franchisees of an oil company who claimed that it was represented to them by the oil company that their contracts would be renewed annually so long as they complied with the company's contractual obligations. The contracts themselves provided only for a one-year duration with right of cancellation on thirty days' notice. The terms of the contracts were, of course, directly contrary to the oral representations made to the plaintiffs which were believed by the jury. Among other things, we held that "we do not think the plaintiff could reasonably have relied upon the allegedly fraudulent statements made in the face of plainly contradictory contractual language." Call Carl, 554 F.2d at 631. We relied on our previous decision to the same effect in Holt v. Quaker State Oil Refining Co., 67 F.2d 170 (4th Cir.1933), as well as on James v. Goldberg, 256 Md. 520, 261 A.2d 753 (1970). 12 Williston on Contracts, Jaeger, 1970, Sec. 1487A is consistent with Kennedy, Zobrist, Call Carl, Holt and James, that, in actions for fraud, reliance on false statements must be accompanied by a right to rely.
 
 
 32
 At this point, it is appropriate to analyze the present case under Kennedy and Zobrist as well as Call Carl.
 
 
 33
 First, neither of the insurers was a novice to the insurance industry. Second, there is no evidence of a long standing relationship between the insurers and EPIC. United Guaranty had reinsured some EPIC loans before insuring the loans which are the subject of this action, but the earliest that United Guaranty had any dealings with EPIC was 1983. Third, the representations EMI made in its meetings concerning the rental deficit contributions being held in escrow were in direct conflict with a written document both insurers had access to--the placement memorandum. This document indicated the funds may have been, or could be, borrowed from. Fourth, there was no fiduciary relationship between EMI and the insurers. As a result, any dealings between EMI and the insurers should have been conducted as an arm's-length transaction. Fifth, the continuing concealment of fraud, in the words of the Kennedy court (changing only the word "appellants' " to the words "the insurers' "), "was only possible because of [the insurers'] ... blind faith in one set of statements.... Further, that blind faith cannot vitiate their opportunity to detect the fraud." Kennedy, 814 F.2d at 805. The insurers had an opportunity to detect the fraud, the sixth factor, when they were given the memorandum. Finally, with regard to the specificity of the representations, the contradictions were apparent from a comparison of the memorandum with the oral representations; either the rental deficit contributions and other partnership assets would be held separately or they would not. That last consideration, after all, is the principal, and very nearly the only, issue on appeal.
 
 
 34
 The case at hand is quite similar to both Kennedy and Zobrist. In each case, parties were given an offering memorandum which contradicted oral representations. Indeed, in the case of United Guaranty, the memorandum must be construed as part of the application EMI submitted and upon which United Guaranty based the underwriting decisions.[13] The insurers, although a step removed from the transaction, guaranteed that the first part (about 25%) of these loans of 95% of appraised value would be paid. Thus, when the contradictions came to light, the insurers gambled financially by not confirming EMI's representations. EPIC's company policies affecting the funds available to pay the debt service obligations of each limited partnership had a direct impact upon whether the loans would be paid according to their terms. When the insurers were furnished with a document containing as much crucial information as the memorandum did, the contradictions between the written and the oral statements should have at the very least prompted the insurers to uncover the truth. Even if the insurers did not know which of the statements were true, they could not act reasonably in relying on one over the other.
 
 
 35
 The facts of our case, the insurance companies' reliance on oral representations when contrary written papers were in their possession, are not different from Call Carl and James. Each of the insurers here had a memorandum in its possession which was contrary to the previous oral representations as to the maintenance of the fund from which the mortgage payments would be made. In Call Carl, there was the contract between the parties which stated a different right of cancellation from an oral representation. We held, as previously noted, that there could be no reasonable reliance on the oral statements in the face of plainly contradictory contractual language. James is to the same effect. In that case a lease provided in terms against its assignment except with the written consent of the landlord. Despite this, the plaintiff took an assignment without the landlord's consent and then sought to become the landlord's tenant rather than the tenant of his assignor. The court held that even if a false representation had been proven to the effect that an assignment was possible without the landlord's consent, the plaintiff had no right to rely upon the false oral representation in the face of the contrary written terms of the lease of which he had knowledge. So Call Carl and James are persuasive authority of our own, or upon which we have previously relied, to the effect that one may not reasonably rely upon an oral statement when he has in his possession a contrary statement in writing.
 
 
 36
 While there were other representations made regarding the workings of the EPIC program and the financial condition of the company, the insurers would not have relied on these without the basis in fact that the funds of the limited partnership would be there when needed. The district court's finding on this point is that:
 
 
 37
 Each of the representations and omissions listed above was material to the decision to insure the EPIC loans. The insurers believed each of those facts to be true. If they had known that any of them were not true, then they would not have agreed to insure or continue insuring EPIC loans.
 
 
 38
 Moreover, a reasonable insurer under the same circumstances would not have agreed to insure the EPIC loans if it had known that any such facts were not true.
 
 
 39
 701 F.Supp. at 1240. Accordingly, we hold that the insurers were not reasonable in relying on the representations concerning the independence of each partnership and the availability of the rental deficit contributions as a fund to pay the mortgage debts. They may not rescind on that account. They have not established a necessary element of their fraud claim, a right to rely on the oral representations.
 
 
 40
 In addition to the claim of fraud, the district court held that the insurers could rescind on the basis of state statutes if statements in an application for insurance were false and material.[14] The appellants argue that these statutes do not apply because the statutes were designed to address written applications whereas the present case involves negotiated mortgage insurance. See 7 Couch on Insurance, 2d, Rhodes, (1985) Sec. 35:36, at 59; see also Home Guaranty Ins. Co. v. Numerica Financial Services, 835 F.2d 1354 (11th Cir.1988). Although the insurance in question did involve a different kind of application process,[15] and while the position of the appellants may be well taken, we need not decide the question of whether the statutes apply because the insurers would not be able to rescind for another reason: "An insurance company cannot avoid liability on the basis of facts known to it at the time the policy was delivered." Rutherford v. John Hancock Mut. Life Ins. Co., 562 F.2d 290, 293 (4th Cir.1977). See also Virginia Mut. Ins. Co. v. State Farm Mut. Auto Ins. Co., 204 Va. 783, 133 S.E.2d 277, 282 (1963). Because both insurers had in their possession the written memoranda contradicting the oral representations as to the availability of the rental deficit contribution funds for mortgage payment, rescission can not be accomplished under the state statutes on that account.
 
 
 41
 It is true that we equate the knowledge the insurers could have gained through reasonable inquiry with actual knowledge of facts sufficient to defeat their right to rescind. Such reasoning is not new; indeed, the authority supporting this proposition is overwhelming. E.g., Supreme Lodge of Knights of Pythias v. Kalinski, 163 U.S. 289, 298, 16 S.Ct. 1047, 1050-51, 41 L.Ed. 163 (1896) (if the company ought to have known of the facts, or with proper attention to its own business would have been apprised of them, it has no right to set up ignorance as an excuse); Rutherford v. John Hancock Mut. Life Ins. Co., 562 F.2d 290, 293 (4th Cir.1977) (whatever puts a person on inquiry amounts in law to 'notice' of such facts as an inquiry pursued with ordinary diligence would have disclosed); Union Ins. Exchange, Inc. v. Gaul, 393 F.2d 151, 154-55 (7th Cir.1968) (rescission unjustified if insurer possessed sufficient facts to require it to make further investigation); Major Oil Corp. v. Equitable Life Ass. Society of United States, 457 F.2d 596, 603 (10th Cir.1972) (insurers with knowledge to put on notice to commence an inquiry can not fail to inquire and defend on ground of willful misrepresentation). See also 16B Appleman, Insurance Law and Practice Sec. 9086, at 547 (1981); 7 Couch on Insurance, 2d, Rhodes, (1985) Sec. 35:254, at 387.
 
 
 42
 In the present case the insurers' possession of the placement memorandum provided the reason to inquire and a reasonable inquiry would have disclosed the misrepresentations. With regard to an investigation, the district court stated, "[t]here is no evidence that the plaintiffs could have discovered the fraud even if they had conducted the investigation defendants claim should have taken place." It supports this conclusion by stating that "the failure of EPIC's own auditors, Fox and Company, and the failure of Touche Ross' extensive audit on behalf of the large insurers to uncover the fraud indicates that even if United Guaranty had conducted an investigation, it would not have discovered the fraud." (Emphasis in original.)[16] This finding also is clearly erroneous.
 
 
 43
 First, in order to detect the fraud the insurers are claiming, the accountants would have had to compare the facts as they found them to the representations EMI made to the insurers. There is no indication in the record or the findings of the district court that either Touche Ross or Fox and Co. were privy to or advised of the oral representations made to the insurers on which the insurers now depend. Second, in its finding concerning the Touche Ross report, the district court found that the report does not give "even the slightest inkling of the grave financial problems which caused EPIC's default," the same problems the insurers claim were misrepresented. Our study indicates the fact is to the contrary.
 
 
 44
 The report indicates that a major source of income to EPIC is derived from the builder fees. The partnerships were tax shelters, and the notes were non-recourse, except for EPIC, without any other obligation. The report also comments on the financial outlook of the company noting that the partnerships are rapidly growing, illiquid, highly leveraged and deficit producing. According to the report, virtually all the partnerships operated at a loss and were funded by advances from EPIC and investor capital contributions; deficits were expected to grow. With regard to EPIC's difficulty in selling homes because of adverse market conditions, the report states, "[t]here seems [sic] to have been difficulties with closing out mature partnerships. As noted above, market conditions during the last three years have discouraged sales to outsiders and the sale of homes has been primarily limited to new EPIC syndications." This delay in selling created more cash demands on the partnerships. According to the report, this resulted in the most pressing problem EPIC faced, anticipating and obtaining sources of funds to cover deficits. The report also notes a lackluster appeal to new investors because of the difficulty mature partnerships had in returning investor capital. Indeed, the report painted a grim picture of EPIC's future.
 
 
 45
 Three other insurance companies had commissioned Touche Ross to conduct the study of EPIC. Officers of United Guaranty did ask about the report, but the district court made no finding that the officers of either company made a request to see the report or actually read the report, which apparently they had not. The report, however, strips much of the weight from the misrepresentations the insurers claim. While the report belonged to the three companies that hired the accountants and they could have refused a request by Foremost or United Guaranty for permission to examine the document, if such permission had been refused, Foremost and United Guaranty would have all the more reason to expect foul play and to commission their own study.
 
 
 46
 In addition, the insurers had the placement memorandum which contained statements inconsistent with the representation that each partnership would stand alone. The placement memorandum discloses EPIC's right to make advances to the partnerships. At first blush, it is true such advances may not seem out of the ordinary because each partnership obtained the original mortgage from the general partner through EMI. When confronted with the size of the advances and asked if the amount of the advances would have affected his decision to insure, however, the president of United Guaranty, William Gillison, testified "[i]t would have told me the facts I had been given were not true." The Chief Executive Officer of United Guaranty's parent company addressing the same issue stated, "that [the amount of the advances] would have frightened me to death. If I had known they had advanced 68 million I would have pulled out a revolver and shot both those boys." He later went on to say that "they could probably have explained them away, probably saying until we get all the equity capital paid in we will go ahead and advance this amount to the partnership." But the advances were not questioned by the insurers for EMI to even give an explanation. When coupled with the information that EPIC could borrow from and lend to the partnerships, no other conclusion could be drawn except that the insurers closed their eyes to the obvious.
 
 
 47
 EMI additionally represented that EPIC had no problem selling the homes of the partnerships after the fifth year. But United Guaranty came to the independent conclusion that the risk of the investment was that the properties could not be sold at the end of the fifth year. Gillison indicated that EPIC had not demonstrated any ability to dispose of the properties. In fact, Gillison proposed an amendment to make EPIC's coverage nonrenewable and for a shorter term. This also demonstrates the insurers had the ability to unearth the misrepresentations.
 
 
 48
 The insurers did not investigate, however. Had they questioned, the lack of credibility of the misrepresentations would have been at once apparent. Having reason to investigate, but choosing not to do so, the insurers are held to all a reasonable investigation would reveal. The insurers took no measures, for example, to ensure that houses were being sold or that new investors were buying into the partnerships. The indicators of fraud were not so well hidden that they were obscure upon reasonable inquiry. Thus, the insurers may not rescind based on the misrepresentations they claim.
 
 
 49
 A discussion of waiver is also in order with regard to the loans United Guaranty insured before it had possession of the placement memorandum. United Guaranty began insuring loans that are the subject of this action on May 1, 1985. It did not receive the placement memorandum, however, until the last week in May. The document was reviewed by its legal counsel not later than May 31, 1985. In spite of the contradictions the document brought to light, United Guaranty continued to accept premiums and insure EPIC loans. It did not refund the premiums previously paid. Only after default and after its attempted rescission did United Guaranty refund any premiums. If an insurer fails to act, however, after it discovers the grounds for rescission, or after it learns facts which would put a reasonably prudent insurer on notice to inquire further, the right to rescind may be waived. Verex Assurance, Inc. v. John Hanson Savings and Loan, 816 F.2d 1296, 1302-03 (9th Cir.1987), citing 7 Couch on Insurance, 2d, Rhodes, (1985) Sec. 35:254 at 386-87. The Supreme Court, addressing the situation where the insurer has knowledge of a reason to rescind and accepts premiums without rescinding, has stated:
 
 
 50
 To hold otherwise would be to maintain that the contract of insurance requires good faith of the insured only, and not of the insurers, and to permit insurers, knowing all the facts, to continue to receive new benefits from the contract while they decline to bear its burdens.
 
 
 51
 Phoenix Mutual Life Ins. Co. v. Raddin, 120 U.S. 183, 197, 7 S.Ct. 500, 506, 30 L.Ed. 644 (1887). The law in this circuit is the same, that upon discovering a basis for rescission, an insurance company must take action to avoid the policy within a reasonable time or it will be deemed to waive the right to do so. Bowles v. Mutual Ben. Health and Acc. Ass'n, 99 F.2d 44 (4th Cir.1938).
 
 
 52
 The placement memorandum, disclosing the inconsistent oral statements, provided United Guaranty with a basis for rescission. Its legal counsel attended the meeting on May 23, 1985, where EMI made oral representations concerning the rental deficit contributions being held in escrow. He also reviewed the placement memorandum when it was sent to him. Despite that review, United Guaranty continued to insure the loans. The fact that the written and oral representations stated opposite facts indicates at the least that one of the two was false. The statements, being material to the risk insured and false, provided a basis for United Guaranty to rescind. It waived its claim for rescission by not rescinding when it gained access to the inconsistent statements. An insurer should not be permitted to rescind when it continues to collect premiums, as here, after coming into the knowledge of facts upon which to base rescission.
 
 
 53
 In addition to their other claims, FNB and Meritor claim that one of the insurers, Foremost, is guilty of violations of the securities laws for insuring the EPIC loans. The district court found that the pass-through certificates were not securities and that other elements of the claim were not established. 701 F.Supp. at 1249. We express no opinion upon most of the questions raised in the briefs or in the district court's opinion with respect to securities violations. Because we do not permit rescission, there has been no damage on account of any claimed reliance in the scattergun counterclaim based on the issuance of the policies in question, and that question is moot. Feldman v. Pioneer Petroleum, Inc., 813 F.2d 296 (10th Cir.1987). Thus, the judgment of the district court in that respect is affirmed, but for a different reason. Securities and Exchange Comm'n v. Chenery, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). So far as the counterclaim is based on other alleged explicit or implicit representations, we are of opinion the finding of the district court that there had been no reliance thereupon is not clearly erroneous.
 
 
 54
 The judgment of the district court is accordingly
 
 
 55
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 *
 Judge Haynsworth participated in the hearing of this case at oral argument but died prior to the time the decision was filed. The decision is filed by a quorum of the panel. 28 U.S.C. Sec. 46(d)
 
 
 [1]
 The third party investors include Dominion Federal Savings and Loan (Dominion) and First National Bank of Maryland, TrusteeB. With regard to this litigation, FNB is trustee for Philadelphia Saving Fund Society (PSFS) (now Meritor Savings Bank), Silverado Banking, Home Federal Savings and Loan of Xenia, Ohio, and Anchor Savings Association.
 EPIC and EMI were subsidiaries of the same financial interests, and we consider them the same, although they were in fact separate corporate entities. The parties have treated them as the same.
 
 
 [2]
 A pass-through certificate as first used here was a certificate of an interest in a pool of first mortgage loans on model homes purchased by EPIC as a general partner in various limited partnerships. The mortgages on the homes served as collateral for a certificate which was rated A and AA by Standard and Poor's and placed privately with a New England Savings institution
 
 
 [3]
 Essentially, the monthly projected rents from a partnership's properties were added to the monthly capital contributions of the limited partners. This total represented the money available to pay the debt service each month. From this total, the debt service was then subtracted to indicate the amount of money needed each month to meet the demands of the debt service. The rental deficit contributions were to pick up this slack over a three-year period. Thus, the amount paid by the builder to an individual partnership would be the present value of the amount needed to cover the partnership's monthly shortfalls over a three-year period
 
 
 [4]
 Eighty of the older partnerships had property values which were inadequate to meet the invested capital of the limited partners. Between 1981 and 1984, EPIC sold only 55 properties in arm's-length sales. During that same year, hundreds of properties were available from partnerships that were in the fifth year of their existence. 701 F.Supp. at 1241
 
 
 [5]
 Resyndicate was the term the district court used to describe EPIC's practice of selling the properties of a partnership already in its fifth year to a new partnership
 
 
 [6]
 So far as the finding of the district court that financial statements were false and misleading, that depended upon the fact that it found that EPIC's auditors had evaluated the value of the real estate held by the partnerships as having appreciated in accordance with national averages, which it apparently had not. An overestimate of the value of the real estate, if indeed this was such, was a fact susceptible to discovery upon even a casual investigation
 An auditor, however, who had been engaged in preparing EPIC's financial statements testified that national averages of increased value had been used rather than actual sales because the national averages were lower than the actual sales and, thus, gave a more conservative picture of the value of the assets of the partnerships. The district court also took issue with the audit because the auditors had not had disclosed to them that a number of the actual sales were in resyndications rather than arms-length transactions. While that may be true, the Touche Ross report mentioned later in this opinion disclosed that the partnerships had not been able to return investor's capital or make arms-length sales. These facts, then, were perfectly apparent to even ordinary observation. Since the principal asset of each partnership was its real estate and the receivables from the partnerships to EPIC were the particular items with which the district court took issue, it is clear that the exercise of even slight prudence would have called for enough of a comparison between actual and book values to assure anyone depending on the financial statements of EPIC, as the insurance companies now say they were, to see that the asset was, in fact, worth the money for which it was carried on the books.
 
 
 [7]
 United Guaranty began insuring the loans which are the subject of this action on May 1, 1985. It did not receive the private placement memorandum until the last week in May. See note 8 infra
 
 
 [8]
 When the insurers agreed to insure EPIC loans, the placement offering memorandum for those loans had not yet been created. Because the memorandum would be prepared subsequently, the insurers could only review a memorandum for an existing partnership. Foremost received a memorandum for EPIC Associates (apparently No. 84-XXXVIII) and United Guaranty received EPIC Associates 85-IV. Although a distinction between the two was made at oral argument, none of the parties argue that there are any significant differences in the documents. We note that, on appeal, EPIC Associates 85-IV is part of the joint appendix
 
 
 [9]
 The district court applied the law of North Carolina with respect to United Guaranty's claims and the law of Virginia with respect to Foremost's claims. Its choice of law is not disputed
 
 
 [10]
 The securities sold in both Kennedy and Zobrist were interests in limited partnerships, not dissimilar to the EPIC ventures here. The written information contrary to the oral statements was in each case a placement memorandum, as here. The similarity of the facts in Kennedy and Zobrist to those here adds to their persuasiveness
 
 
 [11]
 In spite of the fact that the investor did not read the document, the court held him to knowledge of the document stating, "knowledge of information contained in a prospectus or an equivalent document authorized by statute or regulation, should be imputed to investors who fail to read such documents." Zobrist, 708 F.2d at 1518
 
 
 [12]
 We find it significant that the placement memorandum in the case at bar contains a similar warning. The document cautions investors:
 Hypothetical numerical illustrations (which are not projections) are contained in this memorandum to illustrate potential operation of the partnership. Any predictions or representations, written or oral, which do not conform to those contained in this memorandum should be disregarded.
 (Emphasis added to last sentence.)
 
 
 [13]
 United Guaranty's master policy incorporates EPIC's representations, both oral and written, by reference. United Guaranty's master policy in p 21 states:
 The insured agrees that statements made and matters presented by it, the Borrower or any other party in the application for the Policy and in the appraisal, the plans and specifications and other exhibits and documentation submitted therewith or at any time thereafter are the Insured's representations and that the Company has issued the Commitment and Certificate in reliance upon the correctness and completeness thereof.
 
 
 [14]
 The district court cited Virginia Code Sec. 38.1-336 (repealed by Virginia Code Sec. 38.2-309 (1986)) and N.C. Gen.Stat. Sec. 58-30 (recodified by Sec. 58-3-10 (1989))
 
 
 [15]
 At the outset, the insurers had to make the underwriting decision of whether or not they wanted to insure loans originated by EPIC. In order to make their decisions, the insurers relied on representations about the workings of EPIC. The result of this was the issuance of a master policy. The master policy did not constitute a commitment to insure; rather, it merely allowed EPIC to submit loans to the insurers for approval. Subsequently, each loan submitted for approval was accompanied by an application giving information regarding specific details of the particular loan. The district court referred to each of these as a loan package. No falsity in any of the loan applications is brought to our attention
 
 
 [16]
 We note in passing that the district court refers to the Touche Ross report as an audit. However, the report was commissioned by three other mortgage insurers to learn more about the EPIC company. The second page of the document advises that an audit was not performed