841 F.2d 531
 56 USLW 2538, RICO Bus.Disp.Guide 6884
 FLIP MORTGAGE CORPORATION, Plaintiff-Appellee,
v.
Donald H. McELHONE; C. Warren Crandall, Defendants-Appellants
and
Josephine McElhone; Ruth W. Crandall; James Schaffer, Defendants.
FLIP MORTGAGE CORPORATION, Plaintiff-Appellant,
v.
Donald H. McELHONE; Josephine McElhone; C. Warren
Crandall; Ruth W. Crandall; James Schaffer,
Defendants-Appellees.
 Nos. 87-1529, 87-1543.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 5, 1987.
Decided March 4, 1988.
Rehearing Denied April 14, 1988.
 
 Thomas J. Curcio, Robert Dunn (James M. DeSimone, Cohen, Dunn & Sinclair, Alexandria, Va., on brief), for defendants-appellants.
 Craig Smith (Smith & McMaster, P.C., Newtown, Pa., on brief), for plaintiff-appellee.
 Before WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 BUTZNER, Senior Circuit Judge:
 
 
 1
 Donald B. McElhone and C. Warren Crandall, directors and officers of Shamrock Computer Services, Inc. (SCS), appeal a summary judgment entered in favor of Flip Mortgage Corporation (FMC). The principal issue raised by the appeal is whether directors of a dissolved corporation who continue to operate the corporate business in violation of Virginia law are personally liable for debts incurred by the corporation before dissolution. The district court held that Virginia law imposed such liability even though the corporation was subsequently reinstated. We agree with the district court that Virginia law imposes liability on directors who breach their fiduciary duty to creditors to whom the corporation became indebted before dissolution. Nevertheless, we vacate the judgment and remand for determination of the directors' personal liability in accordance with the directions contained in Part II of this opinion.
 
 
 2
 FMC cross-appeals, assigning as error the district court's dismissal of several other claims that it asserted. We affirm the district court's judgment with respect to these issues except for its dismissal of FMC's claim of fraud.
 
 
 3
 * FMC and SCS contracted in 1977 to develop and market a family of computerized mortgage related services. FMC supplied financial expertise, concepts for new products, and marketing efforts, while SCS provided computer expertise, hardware, and computer services to customers. The "Flexible Loan Insurance Program" (FLIP) computer services were distributed primarily through a time-sharing network organized and managed by SCS.[1] SCS billed the users and was obligated under the terms of the contract to remit to FMC 70% of the revenue from customers' usage of the FLIP system. Some income was also derived from licensing the system for use on a separate computer system, and FMC was entitled to 70% of this revenue.
 
 
 4
 In 1982, SCS declared that the 70%-30% formula had become inequitable and unilaterally reduced the sums paid FMC. As a result, FMC filed an action based on diversity of citizenship in the district court for the Eastern District of Pennsylvania. Discovery disclosed that for years SCS had not accounted for all receipts each month, and by this means it had deprived FMC of substantial income. As a result, FMC recovered a judgment of $136,714.11 plus interest. The court also ordered an accounting to determine damages for periods not covered by its monetary judgment and directed that SCS pay FMC its full share of all future revenue.
 
 
 5
 SCS has not satisfied the judgment FMC obtained in the Eastern District of Pennsylvania. According to FMC, it has not furnished the accounting the court ordered nor has it made the required payments on continuing revenues. FMC charges that the directors violated or obstructed the fulfillment of the order by dissipating the assets of the corporation. On April 25, 1985, the day before a hearing was scheduled before the federal court in Pennsylvania on a motion to hold the corporation in contempt for its noncompliance with the judgment, SCS filed a petition for bankruptcy. FMC then commenced this action against the directors, which the district court for the Eastern District of Pennsylvania transferred to the Eastern District of Virginia.
 
 II
 
 6
 Count VI, which is the subject of the appeal taken by McElhone and Crandall (directors), alleged that they became personally liable for debts the corporation incurred before and during dissolution. The statutory basis for this count is Va.Code Secs. 13.1-91 and -92, which provide in part as follows:[2][I]f the corporation fails before the first day of June after the second such annual date to file the annual report or to pay the annual registration fees or franchise taxes ... such corporation shall be thereupon automatically dissolved as of the first day of June and its properties and affairs shall pass automatically to its directors as trustees in dissolution. Thereupon, the trustees shall proceed to collect the assets of the corporations, sell, convey and dispose of such of its properties as are not to be distributed in kind to its stockholders, pay, satisfy and discharge its liabilities and obligations and do all other acts required to liquidate its business and affairs....
 
 
 7
 * * *
 
 
 8
 * * *
 
 
 9
 Upon the entry by the Commission of an order of reinstatement, the corporate existence shall be deemed to have continued from the date of dissolution except that reinstatement shall have no effect on any question of personal liability of the directors, officers or agents in respect of the period between dissolution and reinstatement.
 
 
 10
 The evidence established that for two consecutive years SCS failed to file the annual reports and to pay the annual registration fee and franchise tax. As a result, it was dissolved on June 1, 1983. In violation of the statute, the directors continued to operate the business instead of marshalling corporate assets and paying its creditors. The corporation was reinstated on January 5, 1984. Finding no genuine issue of material fact, the district court entered summary judgment against the directors in the amount of the unpaid judgment, which had been entered by the district court for the Eastern District of Pennsylvania against SCS, plus interest.
 
 
 11
 The directors argue that their liability, if any, is limited to debts incurred by SCS to FMC in the period of dissolution--June 1, 1983, to January 5, 1984. FMC contends that the directors are liable for debts incurred both before and during dissolution. The district court, perceiving the opportunity for abuse if the directors were permitted to avoid liability for pre-existing debts while they operated without a corporate charter, held that the directors were liable to FMC for debts SCS incurred before and during dissolution.
 
 
 12
 There can be no doubt that the directors are liable to FMC for debts incurred during the period of dissolution. Two recent cases have applied the statute to impose liability under these circumstances. See McLean Bank v. Nelson, 232 Va. 420, 350 S.E.2d 651 (1986); Moore v. Occupational Safety and Health Review Comm'n, 591 F.2d 991 (4th Cir.1979). These cases, however, dealt only with debts incurred during dissolution, and the courts had no occasion to consider whether directors were liable for debts incurred before dissolution.
 
 
 13
 People dealing with a corporation are obliged to look to the corporation for satisfaction of their claims. Only in extraordinary circumstances are directors liable for corporate debts. Virginia Code sections 13.1-91 and -92 must be construed in a manner consistent with the strong public policy of shielding directors from individual liability for corporate debt. The statute does not impose any liability for corporate debt on the directors simply because the corporation has been automatically dissolved. Even after dissolution, the directors are shielded from individual liability if they discharge the duties the statute places on them to marshal assets, pay pre-existing debts, and distribute the remaining funds, if any, to the shareholders. Moreover, the directors may temporarily continue the corporate business as an incident to its liquidation without incurring individual liability. See Moore, 591 F.2d at 994 n. 5. If the assets are insufficient to discharge pre-existing debts and the expenses of liquidation, the directors are not liable for the deficiency. Creditors who opted to deal with the corporation when it was a going concern have no cause to complain if they are not paid in full. It is fair to assume that they looked to the corporation's ability to pay, not the directors', when they dealt with the corporation.
 
 
 14
 The directors' difficulty arises when they violate the law and carry on the business instead of liquidating it. They then become personally liable. McLean Bank, 232 Va. 420, 350 S.E.2d 651, and Moore, 591 F.2d 991. This is not inconsistent with the public policy shielding directors, for it cannot be assumed that creditors elected to deal with corporations whose directors have breached the express trust the law imposes on them to pay the creditors.
 
 
 15
 The nature and extent of the directors' liability depend on provisions of the Code that describe the effect of dissolution on the corporation, the function of the directors of a dissolved corporation, the injury caused by the directors' wrongdoing, and the effect of reinstatement.[3] The Supreme Court of Virginia has explained the effect of dissolution on the corporation. "A dissolved domestic corporation is no corporation at all." McLean Bank, 232 Va. at 426, 350 S.E.2d at 656; accord Moore, 591 F.2d at 995.
 
 
 16
 Also, the Supreme Court of Virginia has admonished that where possible every word of the statutes must be given meaning. McLean Bank, 232 Va. at 427, 350 S.E.2d at 656. This principle requires, in the context of this case, a court to give meaning to the word "trustees" in Sec. 13.1-91. Upon dissolution, the directors no longer function as directors of a corporation. Section 13.1-91 provides that they become "trustees" in dissolution. The assets of the corporation automatically pass to them in their new capacity. This is the res of the trust they must administer. Section 13.1-91 also prescribes the duty of the trustees. It is to collect the assets, pay the corporation's obligations, and distribute the remaining funds, if any, to the shareholders. Because the trustees are not authorized to incur new debt, except that which may be essential to wind up the business, it is obvious that the obligations mentioned in section 13.1-91 are pre-existing debts of the corporation. The pre-existing creditors are, along with the shareholders, the beneficiaries of the trust created by the statute.
 
 
 17
 It is when they breach their fiduciary duties as trustees that the directors incur personal liability to the beneficiaries of the trust created by section 13.1-91. Section 13.1-92 provides that such liability, once incurred, is not discharged by the reinstatement of the corporation. McElhone and Crandall breached their fiduciary duties, by using the trust res for operation of the business in violation of the statute instead of paying pre-existing obligations that SCS owed FMC. For this reason they are personally liable to FMC for the damages caused by their breach of trust.
 
 
 18
 The directors assert several additional defenses. The first of these is res adjudicata or collateral estoppel. Although the directors did not plead res adjudicata they pled collateral estoppel. They contend that the directors were exonerated in the Pennsylvania litigation.
 
 
 19
 The district court in Pennsylvania initially denied FMC's motion to join the directors, saying that FMC could bring another action against them if the corporation were to default. Later, in denying a postverdict motion to enter judgment against the directors, the court expressed the opinion that Virginia law did not impose liability on them. FMC appealed the postverdict order to the Court of Appeals for the Third Circuit which held that judgment could not be entered against the directors because they were not parties to the litigation. It did not consider whether they would be liable, had they been parties. Flip Mortgage Corp. v. Shamrock Computer Services, Inc., 770 F.2d 1069 (3d Cir.1985) (unpublished). This record of the proceedings discloses that the liability of the directors was not decided. Consequently, the defense of collateral estoppel is unavailable to the directors. Indeed, FMC is doing what the district court in Pennsylvania initially suggested that it might do--bring a separate action against the directors if the corporation defaulted.
 
 
 20
 The directors also claim that due to the neglect of their registered agent, they did not learn of the dissolution until late December 1983 when FMC raised the issue.
 
 
 21
 Neglect of the registered agent cannot absolve the directors. They were also officers of the corporation and knew or should have known that the corporation was not furnishing the agent the necessary information to file annual reports and that it was not remitting the necessary funds to pay the fees and taxes required by law. A similar defense was rejected by implication in Moore, 591 F.2d at 993.
 
 
 22
 Next, the directors assert that a release signed by FMC absolves them of liability. Initially, FMC contracted with Shamrock Enterprises, a partnership. The contract contemplated that Shamrock Enterprises would be succeeded by a corporation known as Shamrock Computer Services, Inc. (SCS) to be formed in 30 days. The contract provided in part that FMC would not sue the partnership or its partners after the new corporation was formed and undertook the business formerly conducted by the partnership. SCS was formed and it assumed the obligations of the contract as contemplated by the parties. The directors now assert this release of the partnership and its partners as a defense.
 
 
 23
 The short answer is that FMC is not suing McElhone and Crandall as partners or the partnership. None of the damages awarded FMC by the district court arose out of activities conducted by the partnership.
 
 
 24
 In sum, the directors are liable for the full amount of all unpaid debts incurred during the period of dissolution, together with all damages caused by their failure to pay off pre-existing debts upon dissolution. In the district court in Pennsylvania, FMC sought damages against SCS from the date the corporation was formed in 1977 to the date of the trial. Because of deficiencies in the records kept by SCS, the Pennsylvania court's monetary award, upon which the Virginia district court based its judgment, was confined to the period October 1, 1978, to September 30, 1983.[4]
 
 
 25
 In count VI of this suit, FMC sought damages for the entire period from the inception of SCS until its reinstatement on January 5, 1984. On remand, therefore, the task of the district court is twofold. First, it should determine the amount of the debt incurred to FMC during the period of dissolution, from June 1, 1983, to January 5, 1984. This will include the portion of the Pennsylvania judgment properly allocable to that period and the indebtedness incurred to FMC from September 30, 1983, to January 5, 1984. Because the directors operated without a corporate charter they are personally liable for the debt incurred during dissolution and the interest on it. McLean, 232 Va. 420, 350 S.E.2d 651; Moore, 591 F.2d 991.
 
 
 26
 Second, the court must determine the damages caused by the directors' failure in their capacity as trustees to use the assets received at dissolution to pay off the pre-existing debts. Because FMC has received nothing, its damages are potentially as high as the full amount of the debt.[5] The pre-existing debt owed to FMC consists of the portion of the Pennsylvania judgment attributed to the period between October 1, 1978, and June 1, 1983, together with an amount not yet determined for the period from the inception of SCS until October 1, 1978. FMC's damages, however, cannot be more than the amount it would have received had there been no breach of trust. The evidence in the record suggests that the trustees could have discharged most or all of the debt due FMC at the time of dissolution.[6] On remand, the district court should determine the true value of the corporate assets at dissolution and the proportion of that amount that should properly have been distributed to FMC, taking into the equation the debts SCS owed other creditors. This amount will be the limit of the directors' personal liability in their capacity as trustees for the debts incurred before dissolution.
 
 
 27
 In determining these facts, it must be remembered that the burden is on the directors as trustees to produce accurate accounts of the assets and affairs of the trust created by section 13.1-91 and to prove any charges or other debts which they wish to advance to limit their liability to FMC. Restatement (Second) of Trusts Sec. 172 Comments a and b (1959). If it is found that the directors neglected their duty to keep accurate records, they must bear the risk of any uncertainty--they cannot be allowed to profit from uncertainty created by their own wrongdoing.
 
 III
 
 28
 In its cross-appeal, FMC assigns error to the district court's entry of summary judgment on five causes of action set forth in separate counts of the complaint. FMC asserts that the count alleging fraud raises material issues of disputed fact. The charges of fraud advanced by FMC are essentially three: that the appellees never intended to abide by the terms of the November 1977 contract and promised to do so merely to lure FMC into a relationship in which it could be cheated; that from November 1977 until the total disruption of the business relationship SCS submitted false revenue reports to FMC and thereby cheated it out of its rightful earnings; and that the revised interpretation of the contract announced by SCS in November 1982 was asserted in bad faith for the purpose of cheating FMC out of its rightful earnings.
 
 
 29
 Certainly the revised interpretation of the contract was nothing more than a breach of contract: there was neither the misrepresentation of a present fact nor the actual reliance on such a misrepresentation required for all forms of actionable fraud. See Winn v. Aleda Construction Co., 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984); B-W Acceptance Corp. v. Benjamin T. Crump Co., 199 Va. 312, 315, 99 S.E.2d 606, 609 (1957).
 
 
 30
 As to the inducement to enter the contract, it is true that courts properly resist attempts to transfer breach of contract cases into fraud and therefore that fraud "cannot ordinarily be predicated on unfulfilled promises or statements of future events." Soble v. Herman, 175 Va. 489, 500, 9 S.E.2d 459, 464 (1940). But the Virginia Supreme Court recently held that fraud can be found in a breach of contract if the defendant did not intend to perform at the time of contracting. "[T]he promisor's intention--his state of mind--is a matter of fact. When he makes the promise, intending not to perform, his promise is a misrepresentation of present fact, and if made to induce the promisee to act to his detriment, is actionable as an actual fraud." Colonial Ford Truck Sales v. Schneider, 228 Va. 671, 677, 325 S.E.2d 91, 94 (1985). The evidence in the record, viewed most favorably to FMC, indicates that SCS and these individual defendants began submitting false revenue reports almost from the moment the contract was signed. A rational trier of fact could conclude from this that SCS and its officers never intended to abide by the terms of the contract. "Circumstantial evidence is not only sufficient, but in most cases [of fraud] is the only proof that can be adduced." Cook v. Hayden, 183 Va. 203, 209, 31 S.E.2d 625, 627 (1944). We therefore conclude that FMC has alleged a cause of action for fraud based on the principles of Colonial Ford.
 
 
 31
 The regular submission of false revenue reports falls more clearly within the scope of actual fraud. As the district court saw it, "these people didn't pay their bills. Now that may not be exemplary, but its not fraud." But it is alleged that they did more than not pay their bills--an open and obvious breach of contract which could have provoked a speedy response from FMC. FMC charges that they undertook a course of deception intended to make their wrongs seem right, to lead FMC to believe that nothing was amiss, and to lure it into sleeping on its rights. It is just such deception that the law of fraud is intended to punish. Actual fraud requires "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Winn, 227 Va. at 308, 315 S.E.2d at 195. If the proof sustains the allegations, each intentionally falsified revenue report submitted by SCS to FMC, and accepted by FMC as the basis for calculating the sums due to FMC, would satisfy all six of these criteria.
 
 
 32
 We conclude that summary judgment on the fraud count must be vacated. To prevail on remand, however, FMC must prove that McElhone and Crandall personally participated in the alleged fraudulent acts. Moreover, the district court must exercise care that the compensatory damages for fraud do not duplicate damages recovered under count VI.
 
 IV
 
 33
 In connection with the allegations of fraud, many of which involved the use of the mails, FMC sought triple damages under RICO against the directors of SCS.
 
 
 34
 FMC properly alleged the necessary predicate acts, in this case many incidents of fraud in which the mails were used. The only question suitable for summary judgment is whether the acts alleged constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. Sec. 1961(5). We believe that a negative answer is dictated by our recent decisions in Eastern Publishing and Advertising v. Chesapeake Publishing and Advertising, 831 F.2d 488 (4th Cir.1987); HMK Corporation v. Walsey, 828 F.2d 1071 (4th Cir.1987); and International Data Bank v. Zepkin, 812 F.2d 149 (4th Cir.1987). Together, these decisions indicate that this circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims. Bearing in mind that "the heightened civil and criminal penalties of RICO are reserved for schemes whose scope and persistence set them above the routine," HMK, 828 F.2d at 1074, we believe that the scheme in the present case does not rise above the routine, and does not resemble the sort of extended, widespread, or particularly dangerous pattern of racketeering which Congress intended to combat with federal penalties. See Zepkin, 812 F.2d at 155. It is true that FMC's allegations point to fraudulent acts spanning seven years depriving FMC of money properly due to it on many distinct occasions. Nevertheless, FMC's own pleadings present this series of events as part of a single scheme perpetrated by SCS and its directors against a single victim. FMC alleges that the directors of SCS, from the inception of the corporation, never intended to abide by the contract's terms. This plan, FMC alleges, they stuck to persistently and effectively. Given the unity and narrow focus of the scheme, the fact that the planned injury was inflicted and suffered over a period of years cannot convert this single scheme into a pattern within the meaning of RICO.
 
 
 35
 In fact, a great many ordinary business disputes arising out of dishonest business practices or doubtful accounting methods, such as have until the present been redressed by state remedies, could be described as multiple individual instances of fraud, if one chose to do so. But to adopt such a characterization would transform "every such dispute ... [into] a cause of action under RICO." HMK, 828 F.2d at 1074. Our precedents have not adopted an interpretation of the statute producing such a result.[7]
 
 V
 
 36
 FMC further alleges that the officers and directors of SCS drained that corporation of assets through a series of fraudulent conveyances. FMC asks that those conveyances be set aside and that the directors be held liable for all losses resulting from the fraudulent conveyances. Particularly, FMC charges that the directors had SCS: pay unreasonable salaries and grant interest free loans to themselves, purchase home appliances for themselves, pay for various expenses arising from McElhone's hobby of coaching soccer, make improper payments to a partnership owned by the directors, pay for vacation expenses of the directors, purchase equipment and pay for secretarial help used in the directors' non-SCS business activities, make payments for an office condominium purchased by the directors, pay exorbitant rent to the directors as owners of the office space used by SCS, transfer a life insurance policy on Crandall to him for no consideration, transfer two cars owned by SCS to Mrs. McElhone and a dummy corporation owned by Mrs. Crandall for illusory consideration, and transfer SCS's profitable business relationship with a customer to McElhone personally.
 
 
 37
 Whatever may be the merit of these and related allegations, the district court correctly dismissed them from this case. Any fraudulent conveyances were, in the first instance, injuries to the SCS corporation and only secondarily to a creditor such as FMC looking to the assets of SCS for recovery. Now that SCS is in bankruptcy, 11 U.S.C. Sec. 544(b) confers authority on the trustee in bankruptcy to pursue corporate assets improperly transferred.
 
 VI
 
 38
 We affirm the dismissal of count VII for failure to state a claim upon which relief can be granted. This count was based on an alleged breach of fiduciary duty arising out of a joint venture. The district court ruled that there had been no joint venture and hence no fiduciary duty. "Whether or not a given set of circumstances constitutes a joint adventure is generally a question for the jury." Smith v. Grenadier, 203 Va. 740, 744, 127 S.E.2d 107, 110 (1962). However, where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," the court should dismiss a claim. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The contract of November 2, 1977, was attached to and incorporated by reference in the complaint filed by FMC. That contract clearly revealed that no joint venture could be established. To establish a joint venture, Virginia law requires an "agreement to share in the profits or losses" of an undertaking. Ortiz v. Barrett, 222 Va. 118, 131, 278 S.E.2d 833, 840 (1981). FMC and SCS had no such agreement; rather, they were engaged in a fairly straightforward contractual relationship. Although certain receipts were to be split according to a formula, there was no agreement to share profits, and any losses would have been borne by the party suffering them.
 
 
 39
 Again, a joint venture does not exist unless the parties each "have a voice in the control and management" of the enterprise, Ortiz, 222 Va. at 131, 278 S.E.2d at 840, an " 'equal right to direct and govern the movements and conduct of each other in respect thereto.' " Alban Tractor Co. v. Sheffield, 220 Va. 861, 863, 263 S.E.2d 67, 68 (1980) (citation omitted). While FMC had specific contractual rights which gave it narrow authority to control certain SCS business decisions, the great bulk of SCS's decisions were left entirely to the discretion of SCS. And SCS had no control over FMC at all.
 
 
 40
 Accordingly, as shown by the contract made part of the complaint, the relationship between FMC and SCS lacked the degree both of commonality of interest and of mutual control required to establish a joint venture under Virginia law. The dismissal of count VII pursuant to Federal Rule of Civil Procedure 12(b)(6) was therefore proper.
 
 VII
 
 41
 In separate counts FMC also seeks recovery on a theory of constructive trust and on the ground that the district court should pierce the corporate veil. If McElhone and Crandall personally participated in the alleged fraud, there is no need for these counts. If they did not, these counts cannot provide a basis for recovery. Therefore, we affirm the dismissal of these counts to simplify the issues on remand.
 
 VIII
 
 42
 The judgment of the district court is affirmed in part, vacated in part, and the case is remanded for further proceedings consistent with this opinion. FMC, having substantially prevailed, shall recover its costs.
 
 
 
 [1]
 A time-sharing computer network consists of a central computer, which stores programs and performs all calculations, and user terminals. Individual users access the central computer through telephone connections and terminals located in their own offices. Typically, users pay some monthly fee for access privileges plus an hourly rate for time actually spent utilizing the central computer
 
 
 [2]
 Va.Code Secs. 13.1-91 and -92 were recodified as amended in 1985 as Secs. 13.1-752 and -754. None of the minor changes made are material to this case
 
 
 [3]
 Virginia statutes differ from those dealing with dissolution in a majority of the states. Many states preserve a de facto corporate entity during liquidation or absolve the directors from liability if the corporation is reinstated and ratifies what the directors did during liquidation. See Gusky, Dissolution, Forfeiture, and Liquidation of Virginia Corporations, 12 U.Rich.L.Rev. 333, 341-349 (1978). The Virginia Code contains no similar provisions
 
 
 [4]
 The court in Pennsylvania directed SCS to render an accounting for the excluded periods, so that the full debt could be determined, but further proceedings against SCS were preempted by SCS's filing of bankruptcy
 
 
 [5]
 Of course, to prevent a double recovery by FMC, the district court must take account of any monies recovered from SCS through bankruptcy proceedings or otherwise
 
 
 [6]
 A balance sheet dated June 30, 1983, which was shortly after the corporation was dissolved, disclosed that the directors in their capacity as trustees held assets in excess of $149,000 to wind up the business. Current and long-term liabilities were less than $17,000
 
 
 [7]
 The circuits, as is well known, are split on this issue. There is little doubt that FMC's complaint would support a RICO claim under the Second Circuit's test, which requires only "continuing operation" and a common purpose or plan served by the various fraudulent acts. See Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46 (2d Cir.1987)
 Conversely, FMC's RICO claim could not survive the Eighth Circuit's restrictive standard laid out in Superior Oil Co. v. Fulmer, 785 F.2d 252 (8th Cir.1986). That case was factually quite similar to the present one: a single defendant engaged, over a period of time, in multiple fraudulent acts in order to conceal an ongoing and continuous theft of oil from a single plaintiff. The Eighth Circuit considered this continuous theft, with its multiple attendant frauds, as only one racketeering activity and would have required proof that the defendant engaged in other similar activities before conceding that a "pattern" existed.
 The Seventh Circuit, which steers a middle course, recently held that, although they could be "viewed as a part of a single grand scheme," allegations of multiple, distinct fraudulent acts perpetrated on a single victim over a four year period constituted a pattern sufficient to support a RICO claim. Morgan v. Bank of Waukegan, 804 F.2d 970, 976 (7th Cir.1986).