**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KONRAD ERIC POTH; FEROL A. POTH,
in her capacity as Trustee of the
Konrad Forrest Poth 2000 Trust,
                    *Plaintiffs-Appellants,*

v.

CRAIG A. RUSSEY; DOUGLAS J.
BETLACH; ROY D. TARTAGLIA; BRUCE
A. NASSAU; WILLIAM M. SPRAGUE;
V. MICHAEL FITZGERALD; RANDALL R.
LUNN; CREST COMMUNICATIONS
HOLDINGS, LLC; CREST
COMMUNICATIONS PARTNERS, LP,
                    *Defendants-Appellees,*

                    and

LAWRENCE J. TOOLE,
                    *Defendant.*

No. 03-1308

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(CA-02-770-A)

Argued: January 22, 2004

Decided: March 30, 2004

Before NIEMEYER, WILLIAMS, and GREGORY, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** John Martin Wood, REED SMITH, L.L.P., Falls Church, Virginia, for Appellants. Kathryn Cox Ellsworth, DEWEY BALLANTINE L.L.P., New York, New York, for Appellees Russey, Betlach, Tartaglia, Nassau, Sprague, Fitzgerald, and Lunn; Edward Scott Rosenthal, Alexandria, Virginia, for Appellees Crest Communications Holdings, L.L.C., and Crest Communications Partners, L.P. **ON BRIEF:** Paul J. Waters, REED SMITH L.L.P., Falls Church, Virginia, for Appellants. John F. Collins, DEWEY BALLANTINE L.L.P., New York, New York, for Appellees Russey, Betlach, Tartaglia, Nassau, Sprague, Fitzgerald, and Lunn.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

This case is part of the fallout from a merger between two telecommunications firms that took place shortly before the stock market bubble burst in 2001.[1] On June 1, 2000, Viasource Communications, Inc. acquired all of the voting stock of Excalibur Cable Communications, Ltd. from Konrad Eric Poth and the other Excalibur shareholders pursuant to a merger agreement. When Viasource failed to perform some of its contractual obligations, Poth filed a claim against Viasource for breach of the merger agreement. That action was automatically stayed when Viasource subsequently filed for bankruptcy protection from its creditors. Poth then filed this action, alleging that he had been fraudulently induced to sell his stock in Excalibur by several of Viasource's

---

[1]The decline in the stock market during 2001 was especially devastating to the telecommunications sector. *See* Rebecca Blumenstein, *Lives on Hold: As It Deepens, Telecom Bust Is Taking a Heavy Human Toll*, Wall St. J., Aug. 19, 2002, at A1.

officers, directors, and shareholders.[2] He also alleged that the Via-source defendants breached a fiduciary duty owed to him as the creditor of an insolvent company. The district court granted summary judgment to the Viasource defendants on Poth's fraud claims and dismissed the breach of fiduciary duty claim for lack of standing. Poth now appeals, and finding no error, we affirm.

## I.

Because this is an appeal from summary judgment in favor of the Viasource defendants, we state the facts in the light most favorable to Poth, drawing all reasonable inferences from the evidence in his favor. *Edell & Assoc., P.C., v. Law Offices of Angelos*, 264 F.3d 424, 429 (4th Cir. 2001).

Konrad Eric Poth is the founder and former majority owner of Excalibur, a small telecommunications firm.[3] In the fall of 1999, Craig Russey, then president of Viasource, approached Poth to discuss a potential acquisition of Excalibur by Viasource. On March 30, 2001, the parties signed a letter of understanding indicating that the structure of the transaction would be a merger and specifying the essential terms of the merger. During the merger agreement negotiations, each party was allowed access to the records of the other so that each could satisfy its obligation of due diligence. The parties signed a merger agreement (the Agreement) on June 1, 2000.

---

[2]In his complaint, Poth named several officers, directors, and shareholders of Viasource and its affiliates as defendants. We refer to the defendants collectively as "the Viasource defendants."

[3]Ferol Poth, Konrad Poth's wife, is also a party to this action in her capacity as trustee of the Konrad Forrest Poth 2000 Trust, a trust established for the benefit of the Poths' son in connection with the sale of the Excalibur stock. Konrad Poth owned approximately 75% of Excalibur, and the Trust owned approximately 9%. The owners of the remaining 16% of Excalibur are not parties to this action.

Mrs. Poth never had any direct contact with the Viasource defendants and instead relied entirely on representations allegedly made to her husband. Because Mrs. Poth's claims are entirely derivative of the representations underlying Konrad's claims, they require no separate analysis. We will use "Poth" to refer exclusively to Konrad Eric Poth.

### The Agreement

The Agreement provided that Viasource would purchase 100% of the voting shares of Excalibur. The total purchase price was $16,000,000, payable in a combination of cash, subordinated notes (the Notes), and Viasource common stock.[4] The Agreement contained an integration clause, which Poth understood to mean that "everything agreed to was in that agreement." (J.A. at 578.)

The Agreement also provided for a post-closing purchase price adjustment (PPA) to account for any change in the net worth of Excalibur between January 1, 2000, and the closing. Viasource was required to calculate the PPA by August 31, 2000, and pay Excalibur's shareholders for any increase in their company's net worth by September 30, 2000. If Poth disagreed with Viasource's calculation of the PPA, he could object and have the PPA dispute settled by one of the " 'big five' " accounting firms.[5] (J.A. at 642.)

Excalibur's shareholders also agreed to indemnify Viasource against certain enumerated claims. As security for the indemnification obligations, Viasource was entitled to retain 10% of the purchase price for one year. In the event that an indemnifiable claim was filed,

---

[4]The Agreement provided that "the purchase price for all of the issued and outstanding shares of the capital stock of [Excalibur] shall be $16,000,000." (J.A. at 614.) The purchase price was to be satisfied with the following consideration:

> (a) 3,200,000 shares of Viasource Common Stock (the "Stock Consideration"); (b) the sum of Four Million and 00/100 Dollars ($4,000,000) (the "Cash Consideration") . . . ; and (c) the sum of Four Million and 00/100 Dollars ($4,000,000) in the form of a subordinated promissory note . . . .

(J.A. at 614.) Although the Agreement refers to only one promissory note, in fact, two promissory notes were issued to the Excalibur shareholders.

[5]At the time of the Agreement, the Big Five accounting firms were Arthur Andersen LLP, Deloitte & Touche LLP, Ernst & Young LLP, KPMG LLP, and Pricewaterhouse Coopers LLP. *See* Cassell Bryan-Low, *Who Are Winners at Andersen's Yard Sale?*, Wall St. J., May 30, 2002 at C1.

the Agreement required Viasource to give written notice to Excalibur's shareholders of the amount and basis of the claim.

The Agreement further required Viasource and Poth to enter into an employment agreement, which they did. Under the employment agreement, Poth was to be employed for three years at an annualized base salary of $208,000. In the event that Poth was terminated without cause during those three years, Poth was entitled to "an amount equal to one (1) year of base salary . . . payable in equal semi-monthly installments." (J.A. at 1091.) The Agreement also required Poth and Viasource to "use their best efforts to cause Eric Poth to be released from all personal guarantees" of loans made to Excalibur. (J.A. at 643.)

### The Notes

As discussed above, 25% of the purchase price was provided in the form of subordinated promissory notes. The Notes were subordinate to "all senior indebtedness," which included Viasource's indebtedness to General Electric Credit Corporation (GECC) "together with all amendments, modifications, increases, or refinancings thereof." (J.A. at 1101.) The entire principal and interest on the Notes was scheduled to become due eighteen months after the date of the closing, which would have been December 1, 2001. The Notes also were subject to mandatory prepayment in the event that Viasource made an initial public offering (IPO) "pursuant to an effective registration statement on Form S-1 . . . , which contemplates cash proceeds . . . of at least $50,000,000." (J.A. at 1098.) Notwithstanding the maturity date of the Notes, the Excalibur shareholders were not entitled to payment at maturity unless the GECC debt had been paid in full. Poth, however, believed that the Notes were subordinate only to the GECC debt outstanding on the closing date of the merger and claims that he "was never advised until after the fact that the *increased* borrowing from GECC was to be considered senior to the Notes issued despite assurances to the contrary as to what constituted the senior debt to which [his] Notes were subordinate." (J.A. at 1965 (emphasis added).) In any event, Poth alleges that the Viasource defendants assured him that the Notes "would be paid no later than 18 months from the closing, regardless of the success of the IPO." (J.A. at 1961.)

## The Planned IPO

At the time of the merger negotiations, Viasource was planning to make an IPO of its common stock set to occur shortly after the completion of the merger. The Viasource defendants represented to Poth that they anticipated that the IPO would be priced in the $14-$16 per share range and would raise more than $150,000,000. The Viasource defendants continually assured Poth that the IPO would easily satisfy the prepayment conditions of the Notes, *i.e.*, that the IPO would yield cash proceeds in excess of $50,000,000. Despite these representations, Poth knew that there was a chance that the IPO would raise less than $50,000,000. Indeed, Poth's attorney warned him of such a possibility. It is undisputed that neither the Agreement nor the Notes contain any promises or representations about the outcome of a Viasource IPO.

## Events After Closing

The merger closed as planned on June 1, 2000, and Viasource's prospects deteriorated rapidly thereafter. On June 2, 2000, Viasource filed a registration statement on Form S-1 with the Securities and Exchange Commission indicating its intent to make an IPO on August 18, 2000. Viasource initially indicated an intent to offer 11,000,000 shares at $13-$15 per share. As August 18, 2000 approached, however, the market for telecom IPOs began to deteriorate. Viasource filed several amendments to its Form S-1; the last one, which was filed on August 18, 2000, reflected an offer of 5,750,000 shares at $8 per share, for contemplated cash proceeds of only $46,000,000. Accordingly, the prepayment threshold in the Notes was not satisfied.

In addition to the IPO failing to meet expectations, Viasource's performance of its merger agreement obligations disappointed Poth as well. First, Poth and Viasource could not reach agreement as to the amount of the PPA. On December 12, 2000, Viasource submitted its calculation of the PPA and offered to pay Excalibur's shareholders approximately $1,100,000. Poth did nothing with the calculation until March 30, 2001, at which time he submitted his own calculation of the PPA, which was substantially higher than Viasource's calculation. When the parties failed to reach an agreement by June 2001, Poth demanded that the dispute be submitted to an arbitrator, but it never

was arbitrated. Second, although Viasource employed Poth pursuant to the three-year employment agreement until April 2001 when it terminated him without cause, it made full severance payments only until September 2001, at which time cash flow shortages forced Viasource to reduce the payments. Third, Viasource never paid Poth the 10% indemnification holdback, and it never notified him of any indemnifiable claims. Finally, Poth and Viasource disagreed over the payment of the Notes. On January 30, 2001, Viasource requested that Poth extend the due date on the Notes. Poth refused. Viasource then obtained an opinion letter from its counsel, which stated that, under the terms of the Notes, Viasource could not repay the Notes on the maturity date if GECC objected.

Poth filed suit against Viasource in June 2001, alleging that Viasource had breached the Agreement by failing to deliver the indemnification holdback after one year and by failing to obtain releases of Poth's personal guarantees. He later amended the complaint in that action to add an allegation that Viasource had failed to arbitrate the PPA dispute as required by the Agreement.

During 2001, Viasource's financial health continued to deteriorate. Several times it had to seek forbearances from GECC on the senior indebtedness. During the summer of 2001, Viasource and GECC amended the GECC credit agreement to provide for the infusion of $2,450,000 by GECC in exchange for certain promissory notes, titled the Term B Notes. Because they were part of the GECC credit agreement, the Term B Notes were senior to the Notes given to Poth. Several of the Viasource defendants then provided GECC $2,450,000 in exchange for the Term B Notes. Thus, at the end of the day, GECC had no net cash outlay related to the Term B Notes—the Viasource defendants held the debt and bore all of the risk associated therewith.[6]

Despite GECC's forbearances and the cash infusion from the Term B Notes, on November 15, 2001, Viasource filed for bankruptcy pro-

---

[6]As discussed below, Poth's contentions respecting the Term B Notes have evolved over time. Our discussion of the Term B Notes is based on the appellate iteration of the argument, which appears at pages 19 and 33 of Poth's brief.

tection from its creditors. The filing of the bankruptcy petition automatically stayed Poth's breach of contract action.

## II.

In May 2002, Poth filed this action against the Viasource defendants, alleging that they fraudulently induced him to sell his stock in Excalibur. Relevant to this appeal, Poth alleged that the Viasource defendants made the following specific misrepresentations: (1) Poth would be paid the 10% holdback one year after the merger closed absent specifically enumerated circumstances; (2) the PPA would be timely calculated and paid as stated in the Agreement; (3) Poth would be employed for three years or paid one year's severance; (4) Poth would be relieved from his personal guarantees; (5) the Notes would be paid eighteen months from closing at the latest; (6) the Notes were subordinate only to GECC debt outstanding at the closing of the merger; (7) Viasource's IPO would result in proceeds of more than $150,000,000; (8) Viasource's IPO would be priced at $14-$16 per share; and (9) the $50,000,000 prepayment threshold in the Notes could not be reduced, because an identical term was included in notes given to other companies that Viasource had acquired, and Poth could not be given a "better deal" than the shareholders of those companies. Poth alleged that these misrepresentations amounted to fraud under federal and state securities laws and state common law.

Poth also claimed that the Viasource defendants breached their fiduciary duty to him by "delaying any payment to Poth while, at the same time, ensuring payments to themselves." (J.A. at 40.) In essence, Poth alleged that the defendants engaged in self-dealing to ensure that they would be repaid ahead of other Viasource creditors. Poth based this claim on what he calls "the Term B Notes scheme," (Appellant's Br. at 33), which we discuss further in Part IV.

The district court granted summary judgment to the Viasource defendants on the fraud counts and held that Poth lacked standing to bring the fiduciary duty claim because it fell within the exclusive jurisdiction of the bankruptcy court. Poth now appeals, and we affirm.

## III.

### A.

We review the grant of summary judgment de novo. *Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 491 (4th Cir. 2003). "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* at 491-92. "In reviewing the district court's grant of summary judgment, we must construe the facts in the light most favorable to the non-moving party." *Id.* at 492. In reviewing the evidence, we make all reasonable inferences in favor of Poth, the non-moving party. *Thompson v. Aluminum Co. of Am.*, 276 F.3d 651, 656 (4th Cir. 2002). "We make no credibility determinations, and we do not weigh the evidence." *Id.*

### B.

Poth alleges four different causes of action for fraud: federal securities fraud; Virginia state law securities fraud; Virginia common law actual fraud; and Virginia common law constructive fraud. To state a claim for any of these types of fraud, a plaintiff must show, among other requirements, that the defendant made a false statement of material fact on which the plaintiff reasonably relied. *See* 17 C.F.R. § 240.10b-5 (2003) (hereinafter "Rule 10b-5"); *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1027 (4th Cir. 1997) (listing the elements for a federal securities fraud claim under § 10(b) and Rule 10b-5); *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994) (listing the elements of Virginia common law actual and constructive fraud claims); Va. Code Ann. § 13.1-502 (Michie 1999) (using language almost identical to that in Rule 10b-5).

"[C]ourts properly resist attempts to transfer breach of contract cases into fraud[,] and therefore . . . fraud 'cannot ordinarily be predicated on unfulfilled promises or statements of future events.'" *Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 537 (4th Cir. 1988) (quoting *Soble v. Herman*, 9 S.E.2d 459, 464 (Va. 1940)). "Misstatements or omissions regarding actual *past* or *present* facts are far more

likely to be actionable [as fraud] than statements regarding projec-
tions of *future* performance." *Hillson Partners Ltd. P'ship v. Adage,
Inc.*, 42 F.3d 204, 212 (4th Cir. 1994) (quotation marks omitted)
(applying federal securities law); *Patrick v. Summers*, 369 S.E.2d 162,
164 (Va. 1988) ("As a general rule, 'fraud must relate to a present or
a pre-existing fact, and cannot ordinarily be predicated on unfulfilled
promises or statements as to future events.'") (applying Virginia law
and quoting *Soble*, 9 S.E.2d at 464). When a person enters into a con-
tract, however, he implicitly states, as a matter of present fact, that he
intends to perform his obligations under the contract. *Flip*, 841 F.2d
at 537; *Patrick*, 369 S.E.2d at 164. Thus, when a party makes a con-
tractual promise but secretly intends not to perform that promise, "'his
promise is a misrepresentation of *present* fact'" that is actionable as
fraud. *Flip*, 841 F.2d at 537 (quoting *Colonial Ford Truck Sale v.
Schneider*, 325 S.E.2d 91, 94 (Va. 1985)).

In financial and securities matters, when a plaintiff claims to have
relied on oral misrepresentations that are contradicted by later-
received written documentation, the court evaluates the following
eight factors to determine whether the plaintiff's reliance on the oral
statements was reasonable:

> (1) [t]he sophistication and expertise of the plaintiff in
> financial and securities matters; (2) the existence of long
> standing business or personal relationships; (3) access to rel-
> evant information; (4) the existence of a fiduciary relation-
> ship; (5) concealment of the fraud; (6) the opportunity to
> detect the fraud; (7) whether the plaintiff initiated the stock
> transaction or sought to expedite the transaction; and (8) the
> generality or specificity of the misrepresentations

*Foremost Guar. Corp. v. Meritor Sav. Bank*, 910 F.2d 118, 123-24
(4th Cir. 1990) (quotation marks omitted).

The misrepresentations that Poth alleges can be categorized as fol-
lows: (1) statements directly incorporated into the Agreement; (2)
statements contradicted by the Agreement; and (3) statements about
which the Agreement is silent. We deal with each category in turn.

1.

Poth first challenges the Viasource defendants' assurances that Viasource would perform its various contractual obligations under the Agreement. Poth argues that he has presented sufficient evidence from which a jury could infer that the Viasource defendants secretly intended not to perform these promises when they entered into the Agreement. Specifically, Poth contends that the defendants never intended: (1) to pay the 10% holdback one year after the merger absent specifically enumerated circumstances; (2) to timely calculate and pay the PPA as stated in the Agreement; (3) to use their best efforts to have Poth released from his personal loan guarantees; or (4) to employ Poth for three years or pay him one year's severance.

The record contains no direct evidence of a fraudulent intent on the part of the Viasource defendants. Although Poth concedes the absence of a "smoking gun," he nonetheless asserts that a jury reasonably could infer "that because *none* of [the Viasource defendants'] representations came to fruition, the speakers never intended that Poth would receive the consideration represented." (Appellant's Br. at 28, 30.) Poth is mistaken both factually and legally.

Poth's blanket assertion that *none* of Viasource's promises came to fruition simply is inaccurate. First, Viasource entered into an employment agreement with Poth, in the form specified in the Agreement, and employed him pursuant to that contract for over ten months. Viasource eventually terminated Poth without cause, which was permissible under the employment agreement, and made severance payments thereunder until shortly before it filed for bankruptcy protection. Second, Viasource calculated the PPA and sent Poth a settlement agreement outlining the payment of the PPA as calculated. Although Poth eventually disputed the amount of the PPA and exercised his right to dispute resolution, this hardly negates Viasource's partial performance. Finally, Poth improperly focuses on only those provisions of the Agreement that Viasource breached, while ignoring the fact that Viasource performed the vast majority of its obligations under the Agreement. For example, Viasource performed its central obligations when it transferred cash, stock, and the Notes to Poth at closing. Viewing the Agreement as a whole, it is clear that *many*, if not most, of Viasource's promises came to fruition.

Poth's evidence of fraudulent intent thus amounts to nothing more than Viasource's complete failure to perform two contractual obligations and its partial failure to perform two others. This evidence is insufficient to allow a reasonable jury to infer that the Viasource defendants never intended for Viasource to perform its obligations under the Agreement. Indeed, Viasource's partial performance of the Agreement makes such an inference unreasonable. *Cf. Powers v. British Vita, P.L.C.*, 57 F.3d 176, 185 (2d Cir. 1995) ("[I]ntent may be found when a defendant violates an agreement so maliciously and so soon after it is made that his desire to do so before he entered into the agreement is evident."). Moreover, even had there been no partial performance, the mere failure to perform contractual obligations is not enough evidence for a jury reasonably to infer fraudulent intent on the part of the breaching party. *See Patrick*, 369 S.E.2d at 164 (holding that the evidence of mere failure to perform a contractual obligation "is insufficient as a matter of law to show . . . [an] intent to defraud at the time . . . the promise [was made]"); *Powers*, 57 F.3d at 185 ("[T]he mere non-performance of promises is insufficient to create an inference of fraudulent intent." (quotation marks omitted)). Otherwise, plaintiffs could convert every breach of contract action into an action for fraud. Accordingly, we hold that Poth has not raised a material issue of fact as to whether the Viasource defendants secretly intended at the time they entered into the Agreement that Viasource would renege on its contractual obligations. Without a secret intent not to perform, the Viasource defendants did not make a misrepresentation of a material fact at the time they entered into the Agreement.

2.

Poth also alleges that he relied on the following oral representations, which directly contradict the terms of the Notes, which were incorporated by reference into the Agreement: (1) Viasource unconditionally would pay to Poth the principal and interest due on the Notes eighteen months after the closing of the merger at the latest; (2) the Notes would be subordinate only to GECC debt outstanding at the closing of the merger; and (3) Viasource's IPO would result in proceeds of more than $150,000,000.

The Notes state that "in the event of the maturity of this Note, Holder of this Note shall be entitled to payments hereunder only if, prior thereto, all Senior Indebtedness shall have been Paid In Full." (J.A. at 1101.) The Notes define Senior Indebtedness as "all obligations of [Viasource] under [the GECC credit agreement], together with all amendments, modifications, *increases* or *refinancings* thereof." (J.A. at 1101 (emphases added).) The Notes also state that they are subject to mandatory prepayment only if Viasource made an IPO pursuant to a registration statement that contemplated proceeds of more than $50,000,000.[7] By making mandatory prepayment conditional, the Notes clearly imply that there is a chance that the condition for prepayment might not be met, *i.e.*, Viasource might not have an IPO with proceeds of more than $50,000,000. Viasource's oral "guarantee" that the IPO would exceed $150,000,000 is thus belied by the prepayment condition in the Notes.

Because Poth received written documentation that contradicted the alleged oral misrepresentations, we must consider the eight *Foremost Guarantee* factors to determine whether Poth could reasonably rely on the prior oral misrepresentations. *See Foremost Guar.*, 910 F.2d at 123-24. First, Poth is an accredited investor[8] under the Federal Securities laws. As such, he certainly has some "sophistication and expertise . . . in financial and securities matters." *Id.* at 123-24. Second, this was the first securities transaction between these parties, and thus no "long standing business or personal relationships" existed among them. *Id.* Third, Poth undisputedly had "access to relevant information" when he performed his due diligence inquiry. *Id.* Fourth, when the parties negotiated the Agreement, the defendants owed Poth no fiduciary duty. Fifth, Poth has not alleged that the defendants took any actions to "conceal[ ] . . . the fraud." *Id.* Sixth, Poth had "the opportunity to detect the fraud" when he engaged in due diligence and

---

[7]The Notes were also subject to mandatory prepayment if Viasource sold all of its stock or assets, a condition not relevant here.

[8]The term accredited investor is defined to include, among others, "[a]ny natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000" and "[a]ny natural person who had an individual income in excess of $200,000 in each of the two most recent years." 17 C.F.R. § 230.501(a) (2003).

when he reviewed the terms of the Agreement. Thus, the first six factors weigh heavily in favor of the Viasource defendants. The seventh and eighth factors weigh in Poth's favor, as the defendants initiated the transaction, and the alleged misrepresentations are fairly specific. *Id.* Considering all of the factors, we hold that the balance weighs heavily in the Viasource defendants' favor. Accordingly, Poth has failed to raise a material issue of fact as to whether he reasonably relied on the defendant's oral statements.[9]

3.

Poth alleges that the defendants orally made two other false statements, both of which concern subject matters not discussed in the Agreement. Specifically, Poth contends that the defendants represented the following: (1) Viasource's IPO would be priced at $14-$16 per share; and (2) the $50,000,000 threshold in the Notes could not be reduced, because an identical term was included in notes given to other companies that Viasource had acquired, and Poth could not be given a "better deal" than the shareholders in those companies.

Poth has not raised a material issue of fact as to the falsity of either statement. Poth knew that the defendant's representations regarding the IPO were "prediction[s]" about future events. (J.A. at 544-45.) The Viasource defendants' predictions regarding the IPO share price cannot serve as the basis for a fraud claim because they were not statements of present or pre-existing fact. *Hillson Partners Ltd.*, 42 F.3d at 212; *Patrick*, 369 S.E.2d at 164. To the extent that Poth's complaint could be construed as alleging that the defendants never intended to price the IPO at $14-$16, his claim has a defect similar to the ones discussed in Part III.B.1 above. Poth has introduced no

---

[9]Given that Poth understood that the integration clause meant that "everything agreed to was in that agreement" and that he understood that the Agreement basically said that he "better not rely on what [he] ha[d] been told that's outside of the[ ] written documents," (J.A. at 578-79), we question whether Poth has even raised a material issue of fact as to whether he *actually*, let alone reasonably, relied on oral statements that were contradicted by the written terms of the Agreement and the Notes. Nonetheless, it is clear that even if Poth actually did rely on the statements, his reliance was unreasonable.

evidence, other than the fact that the IPO was eventually priced at $8 per share, that the defendants did not intend to price the IPO as they represented. Indeed, all of the other evidence indicates the contrary, especially Viasource's initial S-1 registration form and the early amendments thereto, filed with the SEC in the summer of 2000. In the S-1 amendment dated July 7, 2000, the first filing with an estimated offer price, Viasource anticipated an offering price of $13-$15 per share. Moreover, in January 2000, Viasource's investment bank advised Viasource that it believed that an IPO in the $100,000,000 to $150,000,000 range would "attract significant interest from investors." (J.A. at 137.) In the face of this evidence, no reasonable jury could infer that the defendants secretly intended to price Viasource's IPO below $14 per share at the time that they were negotiating the Agreement with Poth.

As to the second alleged misrepresentation, Poth points to no evidence in the record, and we have found no evidence, that Viasource gave any of the companies that it acquired notes with a lower prepayment threshold than Poth's Notes. In fact, all of the other promissory notes in the record contain the same prepayment threshold as Poth's Notes. Accordingly, Poth has not submitted sufficient evidence from which a reasonable factfinder could conclude that either of these two statements was false when made.

IV.

We next turn to Poth's breach of fiduciary duty claim. The district court held that Poth lacked standing to assert his breach of fiduciary duty claim and that the claim properly could be asserted only by Viasource's trustee in bankruptcy. We review *de novo* a district court's dismissal of a claim for lack of subject matter jurisdiction. *Ahmed v. United States*, 30 F.3d 514, 516 (4th Cir. 1994).

As noted above, Poth has based his breach of fiduciary duty claim on what he calls "the Term B Notes scheme."[10] (Appellant's Br. at

---

[10]In the district court, Poth asserted two different theories of how the Term B Notes transaction was a breach of fiduciary duty. One theory that Poth asserted in the district court was that the Viasource defendants had

33.) Poth asserts that the Viasource defendants "piggybacked" the Term B Notes onto the GECC debt so that the Term B Notes would be senior to Poth's Notes in bankruptcy. (Appellant's Br. at 33.) He alleges that this self-interested transaction was a breach of the fiduciary duty that the officers and directors of an insolvent company owe to the company's creditors.

"If a cause of action is part of the estate of the bankrupt then the trustee alone has standing to bring that claim" *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999). "The § 541 estate . . . includes any right of action the debtor corporation may have to recover damages for misconduct, mismanagement, or neglect of duty by a corporate officer or director." *Delgado Oil Co. v. Torres*, 785 F.2d 857 (10th Cir. 1986) (holding that a state-law action to avoid a preferential transfer by a corporate director was property of the estate of the bankrupt). Creditors similarly lack standing to bring "causes of action [that] are . . . similar in object and purpose to claims that the trustee could bring in bankruptcy," regardless of whether such claims are technically part of the estate of the bankrupt. *Nat'l Am. Ins. Co.*, 187 F.3d at 441 (affirming the dismissal of various state law claims that were "similar in object and purpose" to a bankruptcy trustee's potential fraudulent conveyance claim).

---

provided an infusion of capital in exchange for the Term B Notes so that Viasource could "limp past the one year preferential transfer cutoff date" applicable to corporate insiders. (Pl. Mem. Opp. Sum. J. at 43-44.) In other words, Poth asserted that the defendants made a loan to Viasource to delay the filing of a bankruptcy petition. This delay was just long enough for the defendants to avoid having to repay funds that they had received from the proceeds of Viasource's IPO into the bankruptcy estate. *See* 11 U.S.C.A. § 547(b)(4)(B) (West 1993) (giving bankruptcy trustees the power to avoid any transfer made to a creditor "between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider"). The district court held that Poth lacked standing to bring this claim, and Poth has abandoned this theory on appeal. On appeal, Poth pursues only his other theory, namely that the defendants "intentionally attempted to make [their own loans to the company] superior to the debt already owed to Poth." (Pl. Mem. Opp. Sum. J. at 43.)

Section 548(a) of the Bankruptcy Code allows a bankruptcy trustee to avoid fraudulent conveyances. It provides that the trustee may avoid an obligation "if the debtor voluntarily or involuntarily . . . incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. . . ." 11 U.S.C.A. § 548(a) (West 1993). When a creditor brings a state-law challenge to a transaction that a bankruptcy trustee could avoid as a fraudulent conveyance, the state-law cause of action is "so similar in object and purpose" to the fraudulent conveyance claim that the creditor lacks standing to assert it. *Nat'l Am. Ins. Co.*, 187 F.3d at 441.

In this case, it is clear that the facts alleged by Poth in support of his "piggybacking" theory would support an action by Viasource's trustee in bankruptcy to avoid the Term B Notes transaction as a fraudulent conveyance. The heart of Poth's theory is that the Term B Note transaction was entered into to thwart Viasource's ability to repay its creditors, specifically Poth's Notes. Thus, Poth has alleged that Viasource "incurred an obligation" to repay the Term B Notes, while it "was insolvent," and that the Viasource defendants had the "actual intent to hinder, delay, or defraud an[ ] entity [(Poth)] to which [Viasource] was . . . indebted." 11 U.S.C.A. § 548(a). Under familiar corporate law principles, the knowledge and intent of the Viasource defendants, who authorized the Term B Notes transaction, is imputed to Viasource. *See*, *e.g*, *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 250 (4th Cir. 1967) ("Ordinarily knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation.") . Therefore, even though Poth's breach of fiduciary duty claim and the "trustee's fraudulent conveyance claim do not contain identical elements, they . . . share th[e] same underlying focus." *Nat'l Am. Ins. Co.*, 187 F.3d at 441. As such, Poth's breach of fiduciary duty claim is "so similar in object and purpose" to a potential fraudulent conveyance claim that Viasource's trustee in bankruptcy could bring that Poth lacks standing to assert it. *Id.* Accordingly, the district court properly dismissed Poth's breach of fiduciary duty claim for lack of subject matter jurisdiction.

## V.

For the reasons stated above, we conclude that the district court properly granted summary judgment to the Viasource defendants on Poth's fraud claims and that Poth lacks standing to assert his breach of fiduciary duty claim. Accordingly, we affirm the judgment of the district court.

*AFFIRMED*